OPINION *Page 2 
{¶ 1} Defendant-Appellant, Darrell Saxon, appeals the judgment of the Marion County Court of Common Pleas convicting him of rape. On appeal, Saxon argues that his conviction is contrary to the manifest weight of the evidence; that the trial court erred by admitting hearsay; and, that the trial court erred by preventing him from questioning a witness on the victim's mental state. Based upon the following, we affirm the judgment of the trial court.
 {¶ 2} In April 2007, the Marion County Grand Jury indicted Saxon on three counts of rape, each in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree. The indictment arose after J.M., a twelve year-old inmate of the intensive mental health unit of the Marion Juvenile Correctional Facility ("MJCF"), accused Saxon, another inmate, of engaging in fellatio with him as payment of a gambling debt. Saxon entered a plea of not guilty to all counts in the indictment.
 {¶ 3} In November 2007, the case proceeded to trial, at which time the State moved to dismiss the second count of rape in the indictment, which the trial court granted. Thereafter, the following testimony was heard.
 {¶ 4} The victim, J.M., testified that, from February through March 2007, he resided in the intensive mental health unit at MJCF; that Saxon resided in the same unit; that, because the inmates do not have money, they gamble with their *Page 3 
commissary, which can be used to purchase snacks; that he owed Saxon his commissary as a result of gambling with him; that Saxon informed him that the debt would be satisfied if J.M. performed fellatio on him; that, in March or April 2007, he performed fellatio on Saxon in both a mop closet and a restroom; that, during the mop closet incident, he performed fellatio on Saxon for approximately two minutes; that they were in the mop closet because their unit was cleaning; that a Kyvac power-washer was in the mop closet during the incident; that, during the mop closet incident, the juvenile corrections officers were outside of the unit[1] filling out logs; that, on another occasion, Saxon confronted him in the restroom and told him that he would stab him if he did not perform fellatio on him again; that he performed fellatio on Saxon for approximately two minutes in the restroom; and, that Saxon used force against him in the restroom, but not in the mop closet.
 {¶ 5} J.M. continued that, approximately three weeks after the restroom incident, he told his psychologist, Dr. Wise, about the rape during the course of his psychological treatment; that other inmates asked him about whether the rape occurred, and he told them it did not because he did not want them to tease him; that he never denied that the rape occurred to any of the MJCF staff members; and, *Page 4 
that he did not immediately report the rape because he believed that the unit would go into "lockdown," meaning that all of the inmates would be locked in their rooms. Finally, J.M. testified that two staff members supervised the nine to ten inmates living in the unit; that the intensive mental health unit at MJCF has a podium in the center where a staff member stands; and, that the door to the mop closet is approximately fifteen feet from the podium.
 {¶ 6} Dr. Jason Wise testified that he was a psychology assistant at MJCF for two years; that in February and March 2007, he treated J.M.; that, during the course of his treatment on March 8, 2007, J.M. told him that Saxon threatened to rape him in the restroom; that, during the course of his treatment on March 20, 2007, J.M. informed him that he had "performed oral sex on [Saxon] multiple times with the last time occurring a few days ago" (trial tr., vol. I, p. 171); and, that he reported these statements to the State Highway Patrol. Thereafter, Saxon's trial counsel asked Dr. Wise for what purpose he was treating J.M.; however, the State objected to this question, which the trial court sustained.
 {¶ 7} Damian Cash, an inmate living in the unit at the time of the incident, testified that he was instructed to mop the floor one day and went to the mop closet to get a bucket; that he opened the closet door slightly and saw Saxon and J.M. inside, and observed that J.M.'s hands and lips were on Saxon's penis; that he did not see a power-washer in the closet; that he informed Officer Gary Repp *Page 5 
about the incident; that, two days later, Saxon admitted to him that he engaged in fellatio with J.M. and told him that he wished he would not have; and, that he could not remember the date or month of the incident, but believed it may have occurred "during Christmas or something like that." (Trial Tr., Vol. I, p. 191).
 {¶ 8} Deborah Austin, a record keeper for MJCF, testified that J.M. was twelve years old in February and March 2007; that J.M. came to MJCF on February 2, 2007; and, that the records do not reflect that J.M. was at MJCF during Christmas of 2006.
 {¶ 9} Becky McCoy, administrator for the Circleville Juvenile Correctional Facility, testified that Saxon was eighteen years old in February and March 2007.
 {¶ 10} Trooper Steven K. Herron of the State Highway Patrol Office of Investigative Services testified that he interviewed Saxon about the incident on March 29, 2007; that Saxon admitted to engaging in a sexual act with J.M. on one occasion, but claimed that the act was consensual; that Saxon informed him that the sexual act consisted of J.M. performing fellatio on him for approximately three seconds in the mop closet; that Saxon told him that he walked into the mop closet first, and J.M. walked in later; that Saxon explained to him that the encounter was brief because the juvenile corrections officers were walking back and forth and he was afraid of getting caught; and, that Saxon began to masturbate during the *Page 6 
interview directly after his questioning regarding J.M. and he terminated the interview at that point.
 {¶ 11} Officer Gary Repp testified that he was employed by MJCF in the intensive mental health unit during the alleged time period of the incident; that the unit's juvenile corrections officers often stand at a podium; that the hallway containing the mop closet is directly behind the podium; that, on March 20, 2007, he overheard Harvey Culberth, an inmate, antagonizing and pointing at J.M., saying "[Saxon,] tell these niggers didn't this nigger [J.M.] suck your dick for snacks" (trial tr., vol. II, p. 228), to which Saxon replied, "I ain't gonna lie, yeah" (Id.); that Culberth repeated his question and Saxon again answered "yeah" and "I ain't gonna lie"; that J.M. became very upset during the conversation; and, that the inmates commonly tease each other, but that this was a very uncommon statement for the inmates to use in teasing or antagonizing each other.
 {¶ 12} Officer Repp further testified that the inmates are not allowed to be in the hallway containing the mop closet without permission; that two inmates are not supposed to be in the hallway together without supervision; that two juvenile corrections officers typically supervise the unit at one time, but one may occasionally briefly leave the unit; that, when he gives an inmate permission to go down the hallway, he turns around ninety percent of the time to supervise the inmate; and, that cameras in the unit continuously record the hallway. *Page 7 
 {¶ 13} Officer Tina Swartz of MJCF testified that, on March 22, 2007, Saxon was in an isolation cell where she was assigned to observe him; that Saxon asked her "do you want to know why I'm in there?" and continued that "[J.M.] says that he — that I made him suck my pee-pee * * * well, I did * * * [but] it wasn't the day that he says I did" (trial tr., vol. II, p. 251); that she recorded the statement in the log; that Cash told her that he walked into the mop closet, observed the incident, and walked away; that J.M., Cash, and Saxon had all been assigned to clean the unit on the day that Saxon told her the incident occurred; that commissary is very important to the inmates; and, that they treat commissary as money and often use it as a bargaining tool.
 {¶ 14} David Haines of MJCF testified that he conducts administrative investigations at the facility; that a juvenile corrections officer who had been working at the unit during the time period in question resigned shortly after the investigation of the incident began; that he reviewed videotapes of the unit in conjunction with his investigation to observe the movements of Saxon and J.M.; that he reviewed the period from February 2, 2007, through March 20, 2007; that there were ten or eleven days that he did not observe or was unable to observe due to a computer malfunction; and, that, on the approximately ten dates he did observe, he did not see Saxon and J.M. in the mop closet at the same time, but did observe them walking down the hallway together into a social worker's office. *Page 8 
 {¶ 15} Tracey Cornelli, Assistant Superintendent of MJCF, testified that Saxon was on "suicide watch" on the evening of March 20 until March 22, which meant that he was under the constant close supervision of a juvenile corrections officer; and, that, even though Saxon was periodically in isolation status during the months of February and March, there were multiple days when he and J.M. had access to each other.
 {¶ 16} Saxon testified that he often gambled with J.M. and that, as a result of the gambling, J.M. eventually owed him "lifetime" snacks and commissary; that J.M. paid the commissary at first, but eventually refused; that he threatened to "beat up" J.M. and then told all of the inmates that J.M. had given him oral sex to "shame him," which means to embarrass him, so that he would pay the commissary; that he never intended to beat up J.M. because he is not very violent; that he was never alone with J.M. in the mop closet because it is against the rules and they would have been monitored; that it would be impossible to fit two people and the power washer in the mop closet; and, that Damian Cash never walked into a closet with him and J.M., and he does not know why he says he did.
 {¶ 17} Saxon continued that he never engaged in fellatio with J.M. in the restroom, mop closet, or anywhere else; that he told Trooper Herron, Officer Repp, and Officer Swartz that he engaged in fellatio with J.M. because he wanted to embarrass J.M.; that he told an investigator from the prison office that he *Page 9 
engaged in fellatio with J.M., but that it was consensual; that, when he made these statements, he did not realize the alleged conduct constituted a crime, because it was consensual; that he knew that J.M. was only twelve years old; that he has talked to investigators in the past about engaging in fellatio with young boys; that he understands it is against the law for young boys to perform fellatio on an adult; that he was not masturbating during his interview with Trooper Herron, but that he was attempting to scratch an itch inside his penis; and, that he lied to Trooper Herron, Officer Repp, Officer Swartz, and David Haines, but that he is being truthful now.
 {¶ 18} Thereafter, the jury found Saxon guilty of one count of rape and found him not guilty of the remaining count.
 {¶ 19} In January 2008, the trial court sentenced Saxon to a mandatory ten-year prison term and also found him to be a sexual offender.
 {¶ 20} It is from this judgment that Saxon appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I DEFENDANT-APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT [SIC] IS CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE.
 Assignment of Error No. II THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AND ABUSED ITS *Page 10 DISCRETION BY PERMITTING DR. WISE TO OFFER THE HEARSAY STATEMENTS FROM [J.M.]
 Assignment of Error No. III THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AND ABUSED ITS DISCRETION BY PREVENTING DEFENSE COUNSEL FROM INQUIRING OF DR. WISE THE REASONS THAT HE WAS TREATING [J.M.].
 Assignment of Error No. I {¶ 21} In his first assignment of error, Saxon contends that his rape conviction is against the manifest weight of the evidence. Specifically, Saxon argues that his conviction is against the manifest weight because he fabricated the story that he engaged in fellatio with J.M. in order to embarrass him; because Damian Cash's testimony was not credible; because the security at the intensive mental health unit of MJCF makes J.M.'s version of events nearly implausible; because he was subject to high supervision as a result of being on suicide watch; and, because the security videotapes did not reveal him and J.M. in the mop closet together. We disagree.
 {¶ 22} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way, creating such a manifest miscarriage of justice that the conviction must be *Page 11 
reversed and a new trial ordered. State v. Thompkins, 78 Ohio St.3d 380,387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.
 {¶ 23} The trial court convicted Saxon of rape in violation of R.C. 2907.02(A)(1)(b), which provides:
 (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
 {¶ 24} Here, evidence was presented that J.M., then twelve years old, performed fellatio on Saxon, then eighteen years old, as satisfaction of a gambling debt; that another inmate observed the incident; that J.M. informed his psychologist about the incident; that Saxon told other inmates and juvenile corrections officers that J.M. had performed fellatio on him; and, that Saxon told a State Highway Patrol trooper that J.M. had performed fellatio on him. Although Saxon testified that he did not engage in fellatio with J.M., that Cash's testimony was not credible, and that the facility supervision and absence of videotaped evidence indicates that a rape did not occur, it is clear that the jury found the State's witnesses to be more credible. Additionally, we note that approximately *Page 12 
ten or more days during the time period in question were not observable by video due to a computer malfunction. Further, evidence was presented that Saxon and J.M. had access to each other on multiple days and that the MJCF policies regarding supervision were not consistently followed. This is evident from the testimony of Officer Repp that, although inmates are supposed to be supervised while in the hallway, he only supervises them "ninety percent of the time." Consequently, based on our review of the record, we cannot say that the jury clearly lost its way, and we find that Saxon's rape conviction was not against the manifest weight of the evidence.
 {¶ 25} Accordingly, we overrule Saxon's first assignment of error.
 Assignment of Error No. II {¶ 26} In his second assignment of error, Saxon contends that the trial court erred by permitting Dr. Wise to testify to hearsay statements of J.M. Specifically, Saxon argues that Dr. Wise's testimony that J.M. informed him that he engaged in fellatio with Saxon was inadmissible hearsay and not admissible under Evid. R. 803(4) because the statements were not made for purposes of medical diagnosis or treatment.
 {¶ 27} The admission or exclusion of evidence "lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material *Page 13 
prejudice." State v. Kesler, 3d Dist. No. 13-06-09, 2006-Ohio-6340, ¶ 33. Accordingly, our review is limited to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably. Id., citing State v. Barnes, 94 Ohio St.3d 21, 23, 2002-Ohio-68.
 {¶ 28} Hearsay statements are out-of-court statements made by a declarant, which are then "offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Evid. R. 802 mandates that hearsay is inadmissible unless an appropriate exception applies. Nevertheless, "[a]ny error in the admission of hearsay is generally harmless when the declarant is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature." State v. Geboy,145 Ohio App.3d 706, 721, 2001-Ohio-2214, citing State v. Tomlinson (1986),33 Ohio App.3d 278, 281. Harmless error "`is any error that does not affect the outcome of the case and, thus, does not warrant a judgment overturned or set aside.'" State v. Phillips, 3d Dist. No. 8-06-14,2007-Ohio-686, ¶ 30, quoting State v. Brown, 100 Ohio St.3d 51,2003-Ohio-5059, ¶ 25.
 {¶ 29} Evid. R. 803(4) provides an exception to the hearsay rule for "[statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception *Page 14 
or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."[2]
 {¶ 30} Here, Saxon argues that J.M.'s statements to Dr. Wise do not fall under the Evid. R. 803(4) exception. We need not consider this argument because Saxon has failed to demonstrate any prejudice. Given that J.M. testified at trial and was cross-examined on his statements to Dr. Wise, any potential error was harmless. See Geboy,145 Ohio App.3d at 721; (Trial Tr., Vol. I, p. 156).
 {¶ 31} Accordingly, we overrule Saxon's second assignment of error.
 Assignment of Error No. III {¶ 32} In his third assignment of error, Saxon contends that the trial court erred by preventing his trial counsel from questioning Dr. Wise on why he was treating J.M. Specifically, Saxon argues that he should have been permitted to inquire into J.M.'s treatment as it was relevant to his ability to accurately perceive and recall events, and accurately and truthfully relate these events to the jury. Further, Saxon argues that the State opened the door to this inquiry by relying on Evid. R. 803(4) to render J.M.'s statements admissible. *Page 15 
 {¶ 33} As stated in our analysis of Saxon's second assignment of error, our review of a trial court's decision to admit or exclude evidence is analyzed under an abuse of discretion standard. SeeKesler, supra.
 {¶ 34} Additionally, as we previously stated, harmless error "`is any error that does not affect the outcome of the case and, thus, does not warrant a judgment overturned or set aside.'" Phillips, 2007-Ohio-686, at ¶ 30, quoting Brown, 2003-Ohio-5059, at ¶ 25. In determining harmless error related to the admission or exclusion of witness testimony, "a reviewing court must examine an array of factors, including the importance of the witness's testimony in the [defendant's] case, the cumulative nature of the testimony, the presence or absence of corroborating or contradictory evidence, the scope of cross-examination otherwise permitted, and the overall strength of the prosecution's case." Columbus v. Obasohan, 175 Ohio App.3d 391, 2008-Ohio-797, ¶ 24, citing State v. Lukens (1990), 66 Ohio App.3d 794, 805-806.
 {¶ 35} Here, we find that the trial court's exclusion of Dr. Wise's testimony about his reasons for treating J.M. was harmless. Evidence concerning Saxon's conduct did not rely solely upon the credibility of J.M's testimony, but also on Saxon's own admissions to the conduct to other inmates, several juvenile corrections officers, a prison investigator, and a state highway patrol trooper. Further, J.M. testified at trial and was subject to cross-examination on why he was *Page 16 
being treated by Dr. Wise, as well as his ability to accurately perceive and recall events, and accurately and truthfully relate those events to the jury.
 {¶ 36} Accordingly, we overrule Saxon's third assignment of error.
 {¶ 37} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 SHAW, P.J., and WILLAMOWSKI, J., concur.
[1] We find it unclear from the transcript whether the corrections officers were actually outside of the intensive mental health unit at MJCF, or whether they were inside the unit, but away from their observation post at the podium.
[2] This author questions whether statements made to a psychologist that do not concern treatment of physical ailments fall under the Evid. R. 803(4) exception to the hearsay rule, as the Rule was originally clearly directed to medical treatment or diagnosis for physical ailments. See Evid. R. 803(4) and Staff note: Rule 803. As Dr. Wise was a psychologist, he could not have been providing medical treatment or diagnosis. *Page 1