[Cite as *State v. Bradley*, 2010-Ohio-5422.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,                                    CASE NO. 15-10-03

   PLAINTIFF-APPELLEE,

  v.

GREGORY BRADLEY,                                 **O P I N I O N**

   DEFENDANT-APPELLANT.

Appeal from Van Wert County Common Pleas Court
Trial Court No. CR 09-03-038

Judgment Affirmed

Date of Decision:  November 9, 2010

APPEARANCES:

   *Scott R. Gordon,* **for Appellant**

   *Eva J. Yarger,* **for Appellee**

**Rogers, J.**

{¶1} Defendant-Appellant, Gregory Bradley, appeals from the judgment of the Court of Common Pleas of Van Wert County convicting him of one count each of rape and gross sexual imposition, sentencing him to an indefinite prison term of fifteen years to life, and classifying him as a Tier III Sex Offender. On appeal, Bradley argues that the trial court erred in admitting hearsay statements at trial under both the excited utterance exception pursuant to Evid.R. 803(2), and the medical diagnosis or treatment exception pursuant to Evid.R. 803(4); that his conviction for gross sexual imposition was unsupported by sufficient evidence and that both convictions were against the manifest weight of the evidence; that he was denied the effective assistance of counsel; that the trial court erred in convicting him of both rape and gross sexual imposition where the offenses are allied offenses of similar import; and, that he was denied his right to a fair trial due to cumulative errors committed by the trial court and his trial counsel. Based on the following, we affirm the judgment of the trial court.

{¶2} In March 2009, Bradley was indicted by the Van Wert County Grand Jury on one count of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree; one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree; one count of pandering sexually oriented matter involving a minor in violation of R.C. 2907.322(A)(5), a felony of

the fourth degree; and, one count of illegal use of a minor in nudity-oriented material or performance in violation of R.C. 2907.323(A)(3), a felony of the fifth degree. The indictment arose from allegations by Bradley's daughter, B.B., that he engaged in improper sexual activities with her, including placing his finger in her anus. Bradley entered a not guilty plea to all counts in the indictment.

{¶3} In April 2009, pursuant to Bradley's motion, the trial court separated the trials, with the rape and gross sexual imposition counts to be tried separately from the counts on pandering sexually oriented matter involving a minor and illegal use of a minor in nudity-oriented material or performance.

{¶4} Subsequently, the State filed a notice of its intent to use several hearsay statements pursuant to Evid.R. 807 made by B.B. to her mother, grandfather, and the Van Wert County Department of Job and Family Services ("JFS") regarding Bradley's sexual abuse.

{¶5} In May 2009, the trial court held a hearing on the State's request to use B.B.'s hearsay statements, at which Shelly Bradley[1] testified on direct examination that Bradley was her husband; that they have two children together, B.B., who was five years of age, and K.B., who was two years of age; that, in November 2008, she and Bradley had an argument in which Bradley walked out of the house; that he left the residence around 6:00 or 6:30 p.m., and around 7:00 p.m. B.B. began jumping up and down on the couch and saying that "she was glad

---

[1] We note that Bradley's name was spelled both as "Shelley" and "Shelly" throughout different filings in the record, and we are unsure of which spelling is correct. Accordingly, we elect to spell it as "Shelly."

that daddy was gone so he can't hurt her no more" (motion hearing tr., p. 14); that she behaved in this manner approximately a half an hour after Bradley left; that she sat B.B. down on the couch and asked her to explain what she meant, and she stated that "her dad was touching her in her places, in her private spots, like her butt. She called it her butt and then she said that he would leave [sic] her play with a 'flipper'" (id.); that a "flipper" meant his penis; that she called her father, Allen Shinnaberry, to come to the house and talk to B.B.; that he arrived approximately a half an hour after she called him; that, subsequently, B.B. was "clinging to [her] and she was bawling a lot" (id. at p. 20); that B.B. also had diarrhea and was vomiting that night; and, that she had never caught B.B. lying to her.

{¶6} On cross-examination, Shelly testified that B.B. had separation issues in the past and did not like to leave her presence; that it was not unusual for B.B. to jump up and down on the furniture; that, although B.B. was initially happy upon Bradley's departure, B.B. began crying after she started talking to her; that she does not speak with B.B. about her privates and had never told B.B. that a penis was a "flipper"; that B.B. began jumping up and down almost immediately after Bradley left the residence; and, that her father spoke with B.B. approximately one hour after B.B. began reacting to Bradley's departure.

{¶7} Allen Shinnaberry testified on direct examination that he was Shelly's father; that, on November 1, 2008, he received a call from Shelly

notifying him that Bradley had left the residence; that, a short time later, he received a call from his wife, who told him that there were some issues with B.B.; that he subsequently went to Shelly's house to speak with B.B.; that he left at 7:00 p.m. to go to the residence and went directly there; that, when he arrived, B.B. was acting "different," both "scared and happy" (id. at p. 39); that B.B. told him that she was happy that her father had left; that, he began speaking with B.B., and she indicated to him that "daddy stuck his finger up [her] butt" (id. at p. 40); that B.B. also stated that "I got more grandpa. There are more bad things that dad done, that daddy done" (id.); that B.B. wanted to tell him more, but he told her to not discuss it because she needed to go to the police station; that, up to that point, he thought B.B. had a good relationship with Bradley; that B.B. had never discussed with him any other inappropriate contact by Bradley; that, in his opinion, B.B. would not have made up a story to get rid of Bradley; that, later in the evening, B.B. had vomiting and diarrhea, and she was "horrified, horrified of her dad. Horrified of the house. Horrified of, you know, anything" (id. at p. 45); and, that he has never discussed with B.B. any names for body parts or any sexual acts dealing with them.

{¶8} On cross-examination, Shinnaberry testified that, when he arrived at Shelly's residence, he did not speak with Shelly about what B.B. had said; that he was at the residence for approximately five minutes before he took B.B. to the police station; that, while at the police station, he mentioned to the police officer

that B.B. said something about a "flipper" to his wife, but not to him; and, that B.B.'s sister, K.B., also had diarrhea and vomiting around the same time as B.B.

{¶9} In May 2009, Bradley filed objections to the videotaped deposition of Dr. Lori Vavul-Roediger, asking the trial court to delete from the hearing of the jury hearsay testimony by Dr. Vavul-Roediger regarding Shelly's statements to her concerning the abuse by Bradley. Specifically, Bradley contended that these statements did not fit the exception for statements made for purposes of medical diagnosis or treatment pursuant to Evid.R. 803(4).

{¶10} Subsequently, Bradley also filed a motion in limine to exclude the hearsay statements made by B.B. to her mother and Shinnaberry regarding Bradley's sexual abuse, arguing that the statements were not an excited utterance under Evid.R. 803(2), and did not meet the exception for admissibility contained under Evid.R. 807.

{¶11} On June 2, 2009, the trial court found that the hearsay statements regarding Bradley's sexual abuse made by B.B. to her mother and Shinnaberry were admissible under the excited utterance exception of Evid.R. 803(2). The trial court stated the following in its judgment entry:

**Shelley Bradley**

**The court finds the alleged statement by the child to her mother, Shelley Bradley, are [sic] an "excited utterance" and thus admissible. * * * The alleged statement took place shortly after the Defendant left the home. According to Shelley Bradley, the conversation with the child was in response to the child jumping**

**up and down on the couch shortly after the Defendant left the house. During the conversation, Shelley Bradley noted that the child was both laughing and crying, which goes to display excitement and stress of the event as required by the rule. Also, the alleged statement coupled with the child's excitement and stressed demeanor further indicate that the statement was not a result of reflective thought, but instead a statement made as an excited utterance.**

**Further, the admission of a declaration as an excited utterance is not precluded by questioning which is not coercive or misleading, facilitates the declarant's expression and does not destroy the nervous excitement. In this instance Shelley Bradley simply questioned her daughter as to why she was so excited and happy which elicited the response that she was excited that the defendant could no longer hurt her.**

**Allen Shinnaberry**

**Similar to the situation with Shelley Bradley, the alleged statements made by the child to Allen Shinnaberry are an "excited utterance" and admissible under 803(2).**

**The Court finds the comments made to Allen Shinnaberry were made within a relatively short period of time from the event (Gregory Bradley leaving the house). The court further finds the alleged statements by the child to Allen Shinnaberry were reactive statements and not reflective thinking. Although the statements were in response to questions specifically asked by Allen Shinnaberry, the court finds the child was still in a state of excitement, as noted by his testimony depicting her as both scared and happy, and therefore, the statements she was making were a product of an exciting event.**

(June 2009 Entry and Decision on Defendant's Motions in Limine, pp. 1-2).

{¶12} Subsequently, the trial court also denied Bradley's objections to Dr.

Valvul-Roediger's deposition testimony and found B.B. competent to testify.

{¶13} On June 8 and 9, 2009, the case proceeded to trial, at which Shelly testified on direct examination that she was married to Bradley and they had two children together, B.B. and K.B.; that, in November 2008, she worked part-time at Wal-Mart; that, when she would go to work, B.B. would "scream and bawl and holler that she didn't want [her] to leave" (trial tr., vol. 1, p. 24); that these actions began when B.B. was approximately fifteen months old and continued to get worse as B.B. aged; that, during this time, Bradley was not working and would stay at home and watch the children; that, on November 1, 2008, she and Bradley began arguing, and Bradley walked out of the house; that, after Bradley left the residence, B.B. began jumping up and down on the couch because she was very happy; that B.B. was very excited and "looked like she was relieved that her dad was gone" (id. at p. 26); that she began talking with B.B., and B.B. became very upset and started to cry; that B.B. then proceeded to tell her that Bradley "touched her" and "stuck his finger up her butt" (id. at p. 28); that it was approximately an hour or an hour-and-a-half from the time that Bradley left to the time that B.B. made these statements; that, approximately four or six weeks prior to this incident, B.B. complained of "hurting down there," so she told Bradley that B.B. should go to the doctor, but he said that B.B. did not need to go (id. at p. 30); that, at that time, she observed that B.B.'s vagina was discharging white "slimy stuff," but that it did not appear to be red or irritated (id. at p. 31); that, on a separate occasion, she observed B.B.'s vagina to be red and irritated; that prior to the November 2008

incident, she and Bradley were having marital problems, and she filed for a divorce approximately one week after the incident; that she has been diagnosed with a learning disability and receives social security as a result; that, when she filed for divorce, she was concerned she would not be able to obtain custody of the children because Bradley used to tell her she was "too stupid" to have custody (id. at p. 35); that she never discussed sex acts or any sexual things with B.B.; that, after the November 2008 incident, B.B. attended counseling and also began acting out sexually with other children who were present, including having boys "pull their pants down," and during "one event, she had them lick her." (Id. at p. 38).

{¶14} On cross-examination, Shelly testified that she failed to mention when testifying at a prior hearing that B.B. acted out sexually; that she took B.B. to the doctor on prior occasions due to B.B.'s persistent screaming and crying when she would leave; that the doctor never checked her vaginal area on these visits; that, at some point, Bradley told her to not take B.B. to the doctor anymore because there was nothing wrong with B.B.; that, during the November 1, 2008 incident, Bradley threw a radio across the room at her, but, during her meeting with Dr. Roedinger[2] on November 4, 2008, she stated that Bradley was pushing her; that, later in the evening on November 1, 2008, she took B.B. to the hospital to be examined; that, in the presence of B.B., she informed the hospital personnel of Bradley's sexual abuse of B.B.; that part of the reason she did not file for

---

[2] We assume the testimony regarding the meeting with Dr. Roedinger refers to Dr. Valvul-Roedinger.

divorce prior to the incident was she was afraid she would lose custody of her children; that children's services had visited her home on a previous occasion because of a report by B.B.'s physician that B.B. was not getting fed; that she did not question B.B. until approximately a half-hour after she began jumping on the couch after Bradley left the house; that Bradley left the house around 6:00 p.m., and Shinnaberry did not arrive at the house until 7:00 p.m.; that Shinnaberry talked to B.B. for approximately five minutes when he arrived at the house and then took her straight to the police station; that she was not aware he did not arrive at the police station until 8:45 p.m.; that B.B. was required to take suppositories up until the age of six-months, and Bradley usually administered the suppositories; and, that, during a prior hearing testimony, she did not testify to the slimy, white substance around B.B.'s vagina.

{¶15} Shinnaberry testified that he is Shelly's father and B.B.'s grandfather; that, approximately 7:15 or 7:30 p.m. on November 1, 2008, he was informed by his wife that there was a problem with Shelly and Bradley; that he was at church at that time working at a spaghetti dinner and concert, and had to wait to leave until everyone else left; that, after the concert, he went to Shelly's residence; that, upon arriving at the residence, he was greeted by Shelly, B.B., and K.B., and B.B. seemed upset, although she was not crying; that he took B.B. upstairs to her bedroom; that he asked B.B. if she had anything to tell him, and she stated that Bradley placed his finger in her buttocks; that B.B. also told him "there

[were] more bad things," but he told her he did not want to hear about it (id. at p. 74); that when B.B. told him this, she was "scared and terrified" (id.); that he then took B.B. to the police station to make a report of the incident; and, that, after a police report was made, he took B.B. to the hospital in Toledo to have her examined.

{¶16} Shinnaberry further testified that B.B. had never told him about any previous abuse by Bradley; that he did not notice anything unusual about B.B. prior to their conversation on November 1, 2008; that Shelly filed for a divorce from Bradley shortly after B.B. revealed Bradley's abuse; that Bradley managed the money Shelly received from Social Security Disability during the marriage, but that he now manages it; that he and Bradley "got along" during the marriage (id. at p. 79); that he has never discussed anything regarding private parts with B.B.; and, that, after the incident on November 1, B.B. had problems eating and sleeping, and would defecate in her pants. Shinnaberry continued that he arrived at Shelly's residence at approximately 8:00 p.m.; that, according to the police report, he arrived at the police station at 8:45 p.m.; and, that B.B. and Bradley had a good relationship prior to this incident, but that now, B.B. does not want Bradley to return.

{¶17} Detective Michael Freeman of the Van Wert Police Department testified that, on November 3, 2008, he received a call from Deb Booth of JFS regarding B.B.'s report of sexual abuse; that he then proceeded to Booth's office

and spoke with Shelly; that, subsequently, he interviewed Bradley at the police department; that, during the interview, he asked Bradley about the allegations regarding B.B., and he denied them; and, that Bradley volunteered to provide a DNA sample.

{¶18} Dr. Vavul-Roediger testified via recorded video on direct examination that she was a pediatrician at the Dayton Children's Medical Center; that she examined B.B. on November 4, 2008, in response to a report of sexual abuse; that, prior to the exam, she discussed B.B.'s medical and social history with Shelly and a case worker from Children's Services, including the specific allegations of sexual abuse, because it allowed her to better formulate a medical assessment and diagnosis; that Shelly told her that two or three months ago, B.B. had alleged that Bradley sexually abused her; that, at the time, Bradley told her that B.B. was not being truthful, so she ignored the complaints; that Shelly continued that, on November 1, 2008, B.B. again indicated Bradley had sexually abused her in response to an altercation between Shelly and Bradley; that Shelly further stated that, on November 1, 2008, Shelly attempted to have B.B. examined at two different hospitals but was unable to because she was uncooperative and anxious; that Shelly also stated that B.B. had previously complained of genital and anal itching and that those areas had appeared red in the past, and that B.B. was very fearful of separating from Shelly and was nervous at times; that, during the exam, B.B, refused to cooperate with the majority of her requests, although she,

Shelly, and other hospital staff were able to eventually persuade her to cooperate; that her examination did not reveal any scars or injuries in B.B.'s genital area; that she also did not observe any redness, irritation, or discharge around B.B.'s genitals; that B.B tested negative for gonorrhea, Hepatitis B and C, syphilis, and HIV; that, although there were no genital abnormalities revealed in the examination, the possibility of sexual abuse was not ruled out; that it was very common for a child of B.B.'s age and maturity level to suffer sexual abuse and there be no physical findings; and, that, based on her examination of B.B., she rendered a diagnosis of suspected sexual maltreatment.

{¶19} On cross-examination, Dr. Vavul-Roediger testified that she did not speak one-on-one with B.B. regarding the sexual abuse; that she did not feel it was appropriate to attempt to obtain the details of the abuse from B.B. because she was already anxious and fearful, and because a case worker from Children's Services was present and had just completed a detailed forensic interview with B.B.; and, that if there was no physical evidence of sexual abuse discovered during an examination, a diagnosis of sexual maltreatment would be solely based on the history that was provided to the examiner.

{¶20} Deb Booth testified that she was an investigator for JFS; that she interviewed B.B. on November 3, 2008; that some of the common behaviors of children that have been sexually abused are defecating on themselves, aggression,

regression, and eating difficulties; and, that it was common for sexually abused children to act out sexual behaviors on other children and toys.

{¶21} B.B. testified via recorded video on direct examination that she was five years of age; that she did not remember her father's name or when he lived with her; that her father would touch her buttocks; that she could not remember with what part of his body he would touch her buttocks; that, when he touched her buttocks, it was not a good feeling; that her mother was not around when he would touch her buttocks because she was working; that she saw her father with his clothes off; and, that her father touched her with "this part in the middle," referring to a drawn picture of an unclothed man. (Trial Tr., Vol. 3, p. 178). B.B. then pointed to the vaginal area of a drawn picture of an unclothed girl and stated that her father touched her in that area. B.B. also testified that she saw a white substance come out of her father when he touched her, but that she did not touch the white substance.

{¶22} On cross-examination, and by pointing to drawings, B.B. testified that no one has ever touched her in her private area or in her buttocks, and that her mother has put medication on her buttocks using gloves.

{¶23} Thereafter, the State rested and Bradley made a motion for judgment of acquittal pursuant to Crim.R. 29, which the trial court denied.

{¶24} Bradley testified on direct examination that he was K.B. and B.B.'s father; that he and Shelly had been having marital problems for the past year; that

he attempted to get Shelly to attend marital counseling, but she refused to participate; that, on November 1, 2008, he and Shelly began arguing regarding finances and spending time together; that, as a result of the argument, he left the house between 6:00 and 6:30 p.m.; that he returned around 1:00 a.m. and realized that Shelly had left the residence with the children; that he attempted to see the children at his father-in-law's residence, but he was not allowed in; that he and Shelly are currently going through a divorce; that Shelly received "temporary custody" of the home, so he was forced to leave (trial tr., vol. 4, p. 207); that B.B. had constipation problems, so he would occasionally have to administer suppositories to her; that Shelly was always present when he administered the suppositories, and B.B. always hated receiving them; that B.B. was approximately four years old when he had to administer the suppositories; that, on two occasions, B.B. saw him masturbating, one time when she snuck into the bathroom while he was in the shower, and one time while he was in the bed with Shelly around 4:00 a.m.; that it would have been possible for B.B. to have seen him ejaculate on these occasions; that, on both these occasions, he did not intentionally masturbate in B.B.'s presence; that he tried to cover up when B.B. came into the room while he was masturbating; that he had been remodeling the house, so there was no door to the bathroom; that the only time he placed his finger in B.B.'s anus was when he administered suppositories; and, that he has never raped B.B., placed his penis into her vagina or anus, or had any type of "sexual contact" with her.  (Id. at p. 211).

-15-

{¶25} Subsequently, the jury convicted Bradley on the rape and gross sexual imposition counts.

{¶26} On June 10, 2009, the State dismissed the one count of pandering sexually oriented matter involving a minor and the count of illegal use of a minor in nudity-oriented material or performance.

{¶27} In July 2009, the trial court sentenced Bradley to a prison term of fifteen years to life on the rape count, and a five-year prison term on the gross sexual imposition count, to be served concurrently.

{¶28} In December 2009, this Court dismissed Bradley's appeal for lack of jurisdiction due the failure of the trial court to include the means of conviction in the judgment entry of sentence pursuant to *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, and Crim.R. 32(C).

{¶29} In March 2010, the trial court resentenced Bradley to the same prison term of fifteen years to life on the rape count and five years on the gross sexual imposition count, to be served concurrently.

{¶30} It is from his conviction and sentence that Bradley appeals, presenting the following assignments of error for our review.

### *Assignment of Error No. I*

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DETERMINED THAT [B.B.'S] HEARSAY STATEMENTS MADE TO SHELLY BRADLEY AND ALLEN SHINNABERRY CONSTITUTED AN "EXCITED UTTERANCE" UNDER EVIDENCE RULE 803(2).**

*Assignment of Error No. II*

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DETERMINED THAT SHELLY BRADLEY'S RECITATION TO DR. VAVUL-ROEDIGER, OF [B.B.'S] HEARSAY STATEMENT, WAS ADMISSIBLE UNDER EVID.R. 803(4).**

*Assignment of Error No. III*

**THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE OF EACH AND EVERY ELEMENT OF GROSS SEXUAL IMPOSITION AS ALLEGED IN COUNT TWO OF THE INDICTMENT FOR A JURY TO FIND THAT APPELLANT COMMITTED GROSS SEXUAL IMPOSITION BEYOND A REASONABLE DOUBT.**

*Assignment of Error No. IV*

**THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF BOTH GROSS SEXUAL IMPOSITION AND RAPE BECAUSE THEY ARE ALLIED OFFENSES OF SIMILAR IMPORT.**

*Assignment of Error No. V*

**APPELLANT WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HE WAS PREJUDICED AS A RESULT.**

*Assignment of Error No. VI*

**DUE TO THE CUMULATIVE ERRORS COMMITTED AT TRIAL, APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.**

*Assignment of Error No. VII*

**THE JURY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**{¶31}** Due to the nature of Bradley's arguments, we elect to address assignments of error three and four together, and assignments of error six and seven in reverse order.

*Assignment of Error No. I*

**{¶32}** In his first assignment of error, Bradley argues that the trial court abused its discretion in admitting B.B.'s hearsay statements to Shelly and Shinnaberry regarding the sexual abuse under Evid.R. 803(2)'s excited utterance exception. Specifically, he contends that B.B.'s statements were not an excited utterance, but were the product of reflective thought.

**{¶33}** Initially, we note that Bradley renewed his objections to the hearsay statements of Shelly, Shinnaberry, and Dr. Vavul-Roediger, thereby preserving these issues for appeal. *State v. Clary* (1991), 73 Ohio App.3d 42, 51; Evid.R. 103(A)(1).

**{¶34}** The admissibility of evidence rests within the sound discretion of the trial court, *State v. Adams*, 3d Dist. No. 4-09-16, 2009-Ohio-6863, ¶24, citing *Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 164, and, absent an abuse of that discretion and a showing of material prejudice, an appellate court will not overturn the trial court's ruling. *State v. Rollison*, 3d Dist. No. 9-09-51, 2010-Ohio-2162, ¶32, citing *State v. Martin* (1985), 19 Ohio St.3d 122, 129. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. See *State v.*

*Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶¶17-18, citing Black's Law Dictionary (8 Ed.Rev.2004) 11. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Nagle* (2000), 11th Dist. No. 99-L-089, 2000 WL 777835, citing *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶35} An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is inadmissible at trial unless an exception applies. Evid.R. 801(C); Evid.R. 802; *State v. Messenger*, 3d Dist. No. 9-09-19, 2010-Ohio-479, ¶48.

{¶36} Evid. R. 803 sets forth hearsay exceptions, and provides the following, in pertinent part:

> **The following are not excluded by the hearsay rule, even though the declarant is available as a witness:**
>
> **\* \* \***
>
> **(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.**

Evid.R. 803(2).

{¶37} In order for a hearsay statement to the meet the exception contained under Evid.R. 803(2), the following four elements must be present: "(1) the event must be startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while the declarant was still under the stress of

excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event." *State v. Tebelman*, 3d Dist. No. 12-09-01, 2010-Ohio-481, ¶27, citing *State v. Taylor* (1993), 66 Ohio St.3d 295, 300-301. "The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *State v. Humphries* (1992), 79 Ohio App.3d 589, 598.

{¶38} Furthermore, the excited utterance exception has been liberally applied in cases involving out-of-court statements made by child declarants who were alleged victims of sexual abuse on the basis that the statements made by young children are more trustworthy than those made by adult declarants because of their limited ability to reflect on past incidents. *Tebelman*, 2010-Ohio-481, at ¶27, citing *In re D.M.,* 158 Ohio App.3d 780, 2004-Ohio-5858, ¶13; *Taylor,* 66 Ohio St.3d at 304. Additionally, the amount of elapsed time between the statements made and the events about which the statements are made is longer for a child victim than an adult victim for purposes of admissibility under Evid.R. 803(2) because children are likely to remain in a state of nervous excitement for a longer period of time. *State v. Ashcraft*, 12th Dist No. CA97-11-217, 1998 WL 667657, citing *Humphries*, 79 Ohio App.3d at 598; *Taylor*, 66 Ohio St.3d at 304. Moreover, a child's response to a parent's questions does not destroy the excited state in which a statement was made as long as the questions are not leading or

coercive, do not produce reflective thought, and do not destroy the child's natural focus and expression. *State v. Wallace* (1988), 37 Ohio St.3d 87, 92-93.

**{¶39}** At the May 2009 hearing on the admissibility of B.B.'s statements, Shelly testified that B.B. began jumping on the couch and acting very excited within a half-hour to an hour after Bradley left the residence; that, after she asked B.B. why she was so excited, B.B. responded that Bradley had been inappropriately touching her; that B.B. became very upset shortly after disclosing this information, including crying and not wanting to be apart from her; that approximately one hour after she talked with B.B., Shinnaberry came to the residence and spoke with B.B. about the sexual abuse; and, that B.B. had vomiting and diarrhea that evening. However, Shelly testified at trial that the time between Bradley's departure and B.B.'s excitement was approximately an hour and a half.

**{¶40}** Additionally, Shinnaberry testified that he went to Shelly's residence in response to B.B.'s allegations of sexual abuse; that, when he arrived at the residence, B.B. seemed to be both scared and happy that Bradley left; that B.B. told him that Bradley "stuck his finger up [her] butt" (motion hearing tr., p. 40); and, that B.B. had vomiting and diarrhea that evening because she was "horrified, horrified of her dad. Horrified of the house. Horrified of, you know, anything." (Id. at p. 45).

**{¶41}** While there may be some dispute as to the exact duration between the time when Bradley left the residence and when B.B. became excited, it is clear

from the record that B.B. did become emotionally charged shortly after Bradley's departure, exhibiting both happiness and sadness. This is evident in B.B.'s reaction around her mother and Shinnaberry, and with her vomiting and diarrhea during the evening after she disclosed the abuse. While there may have been a delayed reaction time between the event-causing stimulus of Bradley's departure and B.B.'s emotional outburst, admissibility under Evid.R. 803(2) is more liberally applied in the case of child victims. See *Tebelman*, 2010-Ohio-481, at ¶27; *Ashcraft*, supra.

{¶42} Moreover, we do not find admissibility under Evid.R. 803(2) hindered by the fact that B.B.'s statements regarding the abuse were in response to questions asked by Shelly and Shinnaberry. The questions were merely to inquire into the source of B.B.'s emotional outburst and were not leading or coercive.

{¶43} Consequently, because the record reflects that B.B.'s statements regarding Bradley's sexual abuse were the result of B.B.'s emotional reaction to Bradley's departure, we find that the trial court did not abuse its discretion in admitting the statements under Evid.R. 803(2).

{¶44} Accordingly, we overrule Bradley's first assignment of error.

*Assignment of Error No. II*

{¶45} In his second assignment of error, Bradley argues that the trial court abused its discretion in admitting Shelly's recitation of B.B.'s statements regarding the sexual abuse to Dr. Vavul-Roediger pursuant to Evid.R. 803(4).

Specifically, he contends that the statements were not made for the purpose of medical diagnosis or treatment and were overly prejudicial.

**{¶46}** A trial court's decision on the admissibility of evidence is reviewed for an abuse of discretion, as set forth in our disposition of Bradley's first assignment of error. *State v. Saxon*, 3d Dist. No. 9-08-07, 2008-Ohio-5402, ¶27.

**{¶47}** Evid.R. 803(4) provides a hearsay exception for statements made for purposes of medical diagnosis or treatment. The rule states as follows:

> **The following are not excluded by the hearsay rule, even though the declarant is available as a witness:**
>
> **\* \* \***
>
> **(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.**

**{¶48}** When examining the admissibility of hearsay statements under Evid.R. 803(4), the primary inquiry is whether the statements were made for the purposes of *medical* diagnosis or treatment, as opposed to some other purpose. See *Tebelman*, 2010-Ohio-481, at ¶¶37, 55. (Rogers, J., concurring separately). Additionally, Evid.R. 803(4) has been interpreted to permit into evidence the hearsay statements of a parent who gives information regarding her child to a medical professional for purposes of determining whether the child has been sexually abused. See *State v. Brisco*, 8th Dist. No. 76125, 2000 WL 1222006,

citing *United States v. Yazzie* (C.A.9 1995), 59 F.3d 807, 813. Furthermore, statements made during a medical examination identifying the perpetrator of a sexual assault may also be admissible under Evid.R. 803(4) where the statements were also made for purposes of medical diagnosis or treatment. *In re Weatherholt*, 3d Dist. Nos. 13-99-31, 13-99-32, 2000-Ohio-1633.

{¶49} Moreover, any error in the admission of hearsay evidence may be harmless where the declarant has been cross-examined concerning the hearsay statements, and where the statements provide evidence that is cumulative in nature. *State v. Geboy*, 145 Ohio App.3d 706, 721, 2001-Ohio-2214, citing *State v. Tomlinson* (1986), 33 Ohio App.3d 278, 281.

{¶50} In the case at bar, Dr. Vavul-Roediger testified that she spoke with Shelly prior to her physical examination of B.B.; that Shelly told her that B.B. stated that Bradley sexually abused her; and, that she needed to discuss the specific allegations of sexual abuse because it allowed her to properly formulate a medical diagnosis.

{¶51} Based upon Dr. Vavul-Roediger's testimony, it is clear that Shelly's statements were made for purposes of medical diagnosis or treatment. Furthermore, we find that these statements by Shelly to Dr. Vavul-Roediger were merely cumulative in nature. Both Shelly and Bradley testified to the statements that B.B. made regarding the sexual abuse, and B.B. also testified at trial to Bradley's sexual abuse. As such, we find any error in the trial court's admission

of the statements through Dr. Vavul-Roediger's testimony to have been harmless in this case.

**{¶52}** Accordingly, we overrule Bradley's second assignment of error.

*Assignments of Error Nos. III and IV*

**{¶53}** In his third assignment of error, Bradley claims that his conviction for gross sexual imposition was unsupported by sufficient evidence. Specifically, he argues that no evidence was presented that his touching of B.B. was for purposes of sexual arousal or gratification, and that B.B. only testified to one incident of sexual touching, which was insufficient to support both a rape and a gross sexual imposition conviction.

**{¶54}** In his fourth assignment of error, Bradley argues that the trial court erred in convicting him of both gross sexual imposition and rape because the offenses are allied offenses of similar import. Specifically, he asserts that, because gross sexual imposition is a lesser included offense of rape, and because the State only presented evidence that the sexual abuse occurred on one occasion, he could not be convicted of both offenses.

**{¶55}** When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶47, citing *State v. Jenks* (1981), 61 Ohio St.3d 259,

superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra.

{¶56} Bradley was convicted of rape in violation of R.C. 2907.02(A)(1)(b), and gross sexual imposition in violation of R.C. 2907.05(A)(4). The offenses provide as follows, respectively:

> **(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:**
>
> **\* \* \***
>
> **(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.**

R.C. 2907.02(A)(1)(b).

> **(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**
>
> **\* \* \***
>
> **(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.**

R.C. 2907.05(A)(4).

**{¶57}** Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). In determining whether the contact was for purposes of sexual arousal or gratification, "'the proper method is to permit the trier of fact to infer from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01. In making its decision the trier of fact may consider the type, nature and circumstances of the contact, along with the personality of the defendant. From these facts the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim.'" *State v. Huffman,* 3d Dist. No. 13-2000-40, 2001-Ohio-2221, quoting *In re Alexander*, 3d Dist No. 9-98-19, 1998 WL 767457.

**{¶58}** R.C. 2941.25 requires a two-prong analysis for a determination of whether two offenses are allied offenses of similar import, of which a defendant cannot be convicted of both, and provides as follows:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

**(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

Accordingly, where the two crimes are committed separately, or where there is a separate animus for each crime, the defendant may be convicted of both crimes. *State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625, ¶14.

**{¶59}** At trial, B.B. testified that Bradley touched her buttocks, and that Bradley also touched her vagina. Additionally, B.B. testified that Bradley touched her with his penis, and that she also saw a white substance come out of Bradley's penis. Moreover, both Shelly and Shinnaberry testified that B.B. told them that Bradley inserted his finger in her buttocks.

**{¶60}** Based on the testimony presented at trial, we find that sufficient evidence existed to support a conviction for gross sexual imposition under R.C. 2907.05(A)(4), as testimony was presented that Bradley touched B.B.'s buttocks and vagina, that B.B. was under thirteen years of age, and that Bradley ejaculated, the latter fact being sufficient to allow a reasonable jury to conclude that the contact was for purposes of sexual arousal or gratification.

**{¶61}** Furthermore, we find that two distinct and separate sexual acts were described, one in which Bradley inserted his finger into B.B.'s buttocks, and one in which Bradley touched B.B.'s vagina. The conclusion that two separate acts

occurred is further supported by B.B.'s testimony that Bradley touched her with his penis.

**{¶62}** Consequently, because evidence was presented establishing all the elements of gross sexual imposition under R.C. 2907.05(A)(4), and because B.B. testified to two separate acts, we find that Bradley's conviction for gross sexual imposition is supported by sufficient evidence, and that his convictions for rape and gross sexual imposition are not improper convictions for allied offenses of similar import.

**{¶63}** Accordingly, we overrule Bradley's third and fourth assignments of error.

*Assignment of Error No. V*

**{¶64}** In his fifth assignment of error, Bradley contends that he was denied the effective assistance of counsel. Specifically, he argues that trial counsel failed to object to the testimony provided by B.B., where she was permitted to answer questions by pointing to different circles on a piece of paper, and where the State asked leading and highly suggestive questions during direct examination. We disagree.

**{¶65}** An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph two of syllabus. To show that a defendant has been

prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy* (1992), 63 Ohio St.3d 424, 433, superseded by constitutional amendment on other grounds as recognized by *Smith*, 80 Ohio St.3d at 103.

{¶66} Additionally, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Malone* (1989), 2d Dist. No. 10564, 1989 WL 150798. "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" Id., quoting *Smith v. Murray* (1986), 477 U.S. 527. Furthermore, because attorneys licensed by the State of Ohio are presumed to provide competent representation, *State v. Pierce,* 3d Dist. No. 11-09-05, 2010-Ohio-478, ¶33, citing *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, we must afford a high level of deference to the performance of trial counsel. *Bradley*, 42 Ohio St.3d at 142. Moreover, trial counsel's failure to raise an objection, alone, does not constitute ineffective assistance, and is generally viewed as trial strategy. *State v. Turks,* 3d Dist. No. 1-08-44, 2009-Ohio-1837, ¶43, citing *State v. Conway,* 109 Ohio St.3d 412, 2006-

Ohio-2815, ¶103; *State v. McKinney,* 11th Dist. No. 2007-T-0004, 2008-Ohio-3256, ¶191.

**{¶67}** During B.B.'s testimony, the State asked her several leading questions in order to obtain her testimony, mainly due to the fact that B.B. was reluctant to answer some of the questions and was unresponsive at times. Additionally, when answering the questions, B.B. often pointed to a sheet of paper with the word "yes" in green, and the word "no" in red.

**{¶68}** While leading questions on direct examination are generally impermissible, such questions are permitted when necessary to develop the witness' testimony. Evid.R. 611(C); *Proctor, Director, Ohio Dept. of Transportation v. Kewpee, Inc., et al.*, 3d Dist. No. 1-08-03, 2008-Ohio-5197, ¶26. Here, such leading questions were necessary when dealing with a five-year-old victim who was obviously reluctant to testify while surrounded by strangers regarding sexual acts committed against her by her father. See *State v. Connett*, 5th Dist. No. CA-801, 1995 WL 43626 (trial court did not abuse its discretion in permitting the State to ask leading questions of a child-victim on direct examination where the child was of a young age and where the State needed to elicit specific details regarding sexual activity); *State v. Madden* (1984), 15 Ohio App.3d 130 (trial court did not abuse its discretion in allowing the State to ask leading questions on direct examinations of eight-year-old and twelve-year-old victims regarding explicit sexual acts performed on the victims).

**{¶69}** Moreover, we also find to be permissible B.B.'s use of "yes" and "no" signs to testify. B.B. was declared competent to testify by the trial court, and merely using a small aid to assist her in testifying to multiple frightening incidents in no way prejudiced Bradley.

**{¶70}** Consequently, because we find no error in the State's use of leading questions on direct examination, or in B.B.'s use of a sign to help her testify, we find no error in trial counsel's failure to object to these matters.

**{¶71}** Accordingly, we overrule Bradley's fifth assignment of error.

*Assignment of Error No. VII*

**{¶72}** In his seventh assignment of error, Bradley asserts that his convictions were against the manifest weight of the evidence. Specifically, he contends that no physical evidence was presented by the State to support the convictions; that Shelly's testimony regarding B.B.'s statements lacked credibility due to Shelly's motive to fabricate the story; and, that the State's only evidence of the sexual abuse was inadmissible hearsay statements from Shelly, Shinnaberry, and Dr. Vavul-Roediger, and statements from B.B. that were elicited by suggestive and leading questioning. We disagree.

**{¶73}** When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, superseded by constitutional amendment on other grounds as stated by *Smith,* 80 Ohio St.3d 89, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶74} In the case sub judice, Shelly testified that B.B. became very excited shortly after Bradley left the residence; that B.B. told her that Bradley "touched her" and "stuck his finger up her butt" (trial tr., vol. 1, p. 24); that B.B. made prior complaints to her regarding pain in her vaginal area; that she previously observed B.B.'s vagina to be red and irritated; and, that when B.B. attended counseling after disclosing Bradley's sexual abuse, she acted out sexually with other children.

{¶75} Additionally, Shinnaberry testified that B.B. also told him that Bradley inserted his finger into her buttocks; that B.B. was very frightened when she told him about the abuse; and, that, after B.B. disclosed Bradley's abuse, she had difficulty eating and sleeping, and was sometimes unable to control her bowl movements.

{¶76} Moreover, B.B. testified that Bradley touched her buttocks and vagina; that Bradley would touch her with his penis; that she saw a white substance come out of Bradley's penis; and, that it did not feel good when Bradley touched her buttocks.

{¶77} On the other hand, Bradley testified that he and Shelly had been having marital difficulties over the past year; that he attempted to get Shelly to attend marital counseling, but she refused; that he had to occasionally administer suppositories to B.B. up until she was four years old; that B.B. sneaked into the bedroom on one occasion, and the bathroom on another occasion, and saw him masturbating; that he did not intentionally masturbate in front of B.B., but she might have seen him ejaculate; that the only time he placed his finger in B.B.'s anus was to administer suppositories; that he has never raped B.B. or placed his penis in her anus or vagina; and, that he has never had any "sexual contact" with B.B. (Trial tr., Vol. 4, p. 207).

{¶78} Additionally, Dr. Vavul-Roediger testified that she examined B.B. in regards to the alleged sexual abuse; that B.B. was uncooperative throughout the exam, although she was able to complete the exam; that her examination did not reveal any scars, injuries, redness, or irritation around B.B.'s vagina; that B.B tested negative for gonorrhea, Hepatitis B and C, syphilis, and HIV; and, that she diagnosed B.B. as being suspected of sexual maltreatment because it was very common for a child of B.B.'s age and maturity level to suffer sexual abuse and there be no physical findings.

{¶79} Based on the evidence presented, it is clear that Bradley's conviction was not against the manifest weight of the evidence. Shelly and Shinnaberry both testified to a fearful B.B. telling them of Bradley's sexual abuse, and B.B. also

testified to the same account of the incident as she told her mother and grandfather. While Bradley testified that he never sexually abused B.B.; that B.B.'s account of him touching her buttocks was due to his administration of suppositories to her; and, that B.B. testified that she saw him ejaculate because he inadvertently masturbated in front of her, the jury likely found Bradley's self-serving testimony to be unreliable. See *State v. Lowd*, 3d Dist. No. 5-09-16, 2010-Ohio-193, ¶17, quoting *State v. Thompson* (1998), 127 Ohio App.3d 511, 529 ("The fact-finder * * * occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witnesses' reaction to exhibits and the like").

**{¶80}** Furthermore, the lack of physical evidence of the offenses, as testified to by Dr. Vavul-Roediger, does not necessarily imply the offenses did not occur, as she also testified that it is common for there to be no physical findings in sexual abuse cases.

**{¶81}** Accordingly, we overrule Bradley's seventh assignment of error.

*Assignment of Error No. VI*

**{¶82}** In his sixth assignment of error, Bradley argues that he was denied his constitutional right to a fair trial due to the cumulative errors committed at trial. Specifically, he maintains that the trial court's abuse of discretion in admitting the hearsay testimony of Shelly, Shinnaberry, and Dr. Vavul-Roediger,

along with his trial counsel's errors in failing to object to the content, manner, and procedure of B.B.'s testimony, all combined to prejudice his right to a fair trial.

**{¶83}** Because we have found no prejudicial errors in the aforementioned arguments set forth in the previous six assignments of error, Bradley's argument must also fail that cumulative errors at trial denied him his constitutional right to a fair trial.

**{¶84}** Accordingly, we overrule Bradley's sixth assignment of error.

**{¶85}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and SHAW, J., concur.**

**/jnc**