[Cite as *State v. Bump*, 2013-Ohio-1006.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 8-12-04

    v.

JOHN C. BUMP,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR 10-07-0129

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:   March 18, 2013**

APPEARANCES:

    *Marc S. Triplett* **for Appellant**

    *Eric C. Stewart* **for Appellee**

**ROGERS, J.**

{¶1} Defendant-Appellant, John Bump, appeals the judgment of the Logan County Court of Common Pleas convicting him of rape and gross sexual imposition and sentencing him to a prison term of 19 years to life. On appeal, Bump argues that the trial court erred by: (1) denying his motion to suppress the search of his residence; (2) denying his motion to sever; (3) admitting various items of improper evidence; (4) limiting the cross-examination of a critical witness in the trial; (5) admitting testimony that violated his confrontation rights under the Sixth Amendment; and (6) imposing costs and attorney fees upon him without addressing those items in open court. Bump also contends that all of the above errors combined to deprive him of due process. For the reasons that follow, we affirm in part and reverse in part the trial court's judgment.

{¶2} On February 8, 2011, the Logan County Grand Jury indicted Bump on the following counts relating to the victim, S.E.: (1) five counts of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree; and (2) five counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. Bump was also indicted on the following counts relating to the victim, L.C.: (1) one count of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree; and (2) one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree.

{¶3} The indictment arose from Bump's alleged sexual abuse of S.E., a female, and L.C., a male. The indictment alleged that the abuse of S.E. spanned from 2005 to 2009 when she was between seven and eleven years old. Meanwhile, the indictment alleged that Bump's abuse of L.C. occurred from 2006 to 2009, when he was between five and eight years old. At the time of the abuse, Bump had custody of S.E., who is not his biological daughter, and L.C. lived in Bump's residence since he is the son of Lora Carmen, who was Bump's live-in girlfriend at the time.

{¶4} In August 2011, Bump filed a motion to sever and a motion to suppress. The severance motion requested that the trial court hold separate trials with one trial on the counts involving S.E. and one trial on the counts involving L.C. The suppression motion requested that the trial court exclude all evidence seized from Bump's residence during a warrantless search executed on April 21, 2010. Specifically, Bump sought the exclusion of evidence obtained from the seizure of his computers, including the various pornographic materials discovered on their hard drives.

{¶5} On September 22, 2011, the trial court conducted a hearing regarding Bump's suppression motion. Carmen testified as to her involvement with the warrantless search. She indicated that she and Bump had an on and off romantic relationship from 2003 until April 17, 2010. As part of their relationship, Carmen

had lived with Bump for several portions of the time period between 2004 and 2010.

{¶6} Carmen testified that she was living in Bump's residence in April 2010. As part of their living arrangement, Carmen kept all of her possessions at Bump's residence and she shared joint access to the computers in the residence. After Carmen learned of the allegations against Bump, she stopped sleeping at his residence, beginning on April 17, 2010, which is when she first reported S.E.'s allegations to the police. On April 21, 2010, the police called Carmen to obtain her permission to search Bump's residence. She agreed and met the officers at the residence. At that time, Carmen unlocked the door of the residence and let the officers in to execute the search.

{¶7} On cross-examination, Carmen testified that her romantic relationship with Bump ended on April 17, 2010. The following exchange explored the effect of the relationship's end on Carmen's living arrangement at Bump's residence:

> Q: And on April 17, 2010, you moved out of the apartment intending never to return, correct?
>
> A: I hadn't gotten all of my things out, but I hadn't – I'm sorry.
>
> Q: But you moved everything you had [an] immediate need for on the 17th of April, correct?
>
> A: Yes.
>
> Q: You did not spend another night at [Bump's residence], did you?

A:    It was – no.

* * *

Q:    Okay.  But what was your intent.

A:    To leave?

Q:    To leave permanently.

A:    Yes.  Sept. 22, 2011 Tr., p. 30-32.

Carmen also explained that after the police executed the search, she stayed at the residence "for a couple of hours" to remove her remaining possessions. Sept. 22, 2011 Tr., p. 40.

{¶8} In the course of her cross-examination, Carmen also identified her written police statement and that of her cousin, Amanda Taylor, both of which were made on April 17, 2010.  In her police statement, Carmen listed the address of Bump's residence as her own.  She also indicated that on that date, she "got some things from [Bump's residence] like clothes" before going to the police station.  (Defendant's Exhibit A, p. 2).  Meanwhile, Taylor's statement indicated that she assisted Carmen with "get[ting] her things * * * from [Bump's residence]."  (Defendant's Exhibit B, p. 1).

{¶9} Detective Dwight Salyer of the Bellefontaine Police Department then testified regarding his role in the search and investigation.  He indicated that at the time of the search, Bump was incarcerated.  He further attested that before the search, he knew that Carmen was Bump's live-in girlfriend.  The following

exchange occurred regarding Detective Salyer's understanding of Carmen's living situation on April 17, 2010:

Q: So, you knew that Ms. Carmen had vacated the residence.

A: I knew that she was staying with someone else at the time, yes. Sept. 22, 2011 Tr., p. 47-48.

Still, Detective Salyer testified that he believed Carmen had the authority to consent to the search of Bump's residence because "she was living there" and "wasn't evicted from the home." Sept. 22, 2011 Tr., p. 52.

{¶10} On September 29, 2011, the trial court denied Bump's severance and suppression motions. The basis for denying the suppression motion was that Carmen had authority over Bump's residence on the date of the search and she consequently provided proper consent for the warrantless search.

{¶11} Before trial, Bump filed two motions in limine. The first sought to exclude out-of-court statements made by S.E. and L.C. regarding their allegations of abuse. Specifically, Bump sought to exclude the recorded interviews of the victims, Carmen's testimony regarding the victims' statements, and evidence of the victims' statements to mental health professionals. The second motion requested the exclusion of evidence regarding the contents of the computers seized from Bump's residence. On January 23, 2012, the trial court denied Bump's motion regarding the exclusion of the computer evidence. It also denied his request to exclude S.E.'s and L.C.'s out-of-court statements to Carmen and the

mental health professionals. However, the trial court did exclude video interviews of the victims from evidence.

**{¶12}** On January 24, 2012, the trial court, upon the State's motion, dismissed two of the rape counts and two of the gross sexual imposition counts relating to Bump's alleged abuse of S.E. The trial of this matter also commenced on that day.

**{¶13}** Carmen was the first witness called to the stand. She testified that the residence she shared with Bump, S.E., L.C., and S.E.'s two younger brothers, was small, and that it only had one bathroom and two bedrooms. She also indicated that Bump was often the only adult in the residence with the children since she and Bump worked different shifts. As to the events of April 17, 2010, Carmen testified as follows:

> Q: And what was going on with [S.E.]?
>
> A: [S.E.], she was more like depressed. [S.E.'s] pretty outgoing normally, and she was just like – it's like she started losing interest in, okay, let's clean the house. No, she didn't want to go play with the boys. She just seemed like she was losing interest in stuff she normally did.
>
> Q: Okay. And did [S.E.] tell you something * * * that caused you some concern?
>
> A: Yes.
>
> Q: How did that come out?

A:   She just kind of blurted it out – she was – she was on one subject talking about [another one of the children living with them], and then she's like and – she blurted it out.

Q:   Did it appear that she had had time to think about what she was going to say at all?

A:   No.  Trial Tr., p. 123-24.

**{¶14}** At this point, the prosecutor and defense counsel approached the bench to discuss the admissibility of Carmen's testimony as to S.E.'s statements. The trial court ultimately allowed Carmen to continue testifying regarding the statements.  As a result, the colloquy continued as follows:

Q:   So what did [S.E.] – what did she blurt out? What did she say?

A:   She said I've also been having problems with my dad, meaning [Bump].

* * *

Q:   And what did she say?

A:   I said what kind of problems are you having?  And she said, well, when you're at work and the [other children] are in bed, he makes me watch videos of people having sex, he makes me touch his penis – I'm sorry.  She said he made him – made her put his penis in her mouth, and that he's put his penis between her legs, and she said that when he did those things white stuff came out.  Trial Tr., p. 125-26.

**{¶15}** After S.E. made these allegations, Carmen took S.E. and the other children to a relative's house and called the police.  Once she was moved out of Bump's residence, she noticed that L.C. was not acting normally: "[L.C.] was not [L.C.].  [L.C.] was closed off and just of – it's like he had just curled up into

himself. He wasn't sleeping at night. I mean, he was getting stomach aches all of the time and he was having nightmares." Trial Tr., p. 131. The following exchange occurred regarding L.C.'s behavior:

Q: Okay. Now, about two months later after April 17[, 2010], you called the police again.

A: Uh-huh.

Q: What was going on?

A: [L.C.] had woke up from a nightmare one night – which happened a lot – and I asked him if he wanted to talk about it. So I let him. And I was just trying to tell him you know, everything's okay. If anything's bothering him, just let me know, we'll try to fix it together. I just want to lay here. I just want to lay here. And so we laid there for a few minutes, and he sat up and he said mom, I have something to tell you. The stuff that [Bump] did to [S.E.] he did to me too. Trial Tr., p. 131.

Bump's trial counsel did not object to Carmen's testimony regarding L.C.'s out-of-court statements. Once again, Carmen reported the allegations to the police.

{¶16} S.E. was then called to the stand and offered the following testimony regarding Bump's sexual abuse. Bump started to abuse her when she was seven years old and it was progressive in that it began with touching and then moved on to oral sex and simulated vaginal sex. S.E. indicated that Bump never vaginally penetrated her with his penis because he was worried that if he did, he would get caught. S.E. did testify that Bump digitally penetrated her vagina on a variety of instances.

{¶17} S.E. stated that Bump ejaculated after the sex acts and that in some instances he rubbed the semen on her. On at least one occasion of oral sex, Bump told S.E. to swallow the semen, which she said caused her to get sick. S.E. testified as to the appearance, color, and taste of the semen. She also testified that Bump watched pornographic materials with her before forcing her to engage in the sex acts that were depicted in the materials.

{¶18} S.E. attested that Bump threatened her that if she ever divulged his actions, she would be separated from her younger brothers. She also indicated that when she performed the sex acts that Bump wanted, he gave her special privileges like staying up past bedtime. When S.E. was nine or 10 years old, she told Bump that she no longer wanted to perform the sex acts. After that time, the abuse stopped, but S.E. testified that on several occasions after the end of the abuse, Bump would say that "[she] knew how to earn" special privileges. Trial Tr., p. 181.

{¶19} On cross-examination, S.E. admitted that in 2006 she told Carmen about the abuse, but that she recanted when she realized that Carmen did not believe her. She also acknowledged that Bump was the disciplinarian in the house, that he spanked her, and that her relationship with him was tenuous for the year before she disclosed the abuse to Carmen and the police. Further, S.E. admitted that she had told Bump and others before reporting the abuse that she

wanted to live with her biological mother, Dezri KeKahuna. However, she denied having ever talked about the abuse with L.C.

{¶20} On redirect, the State offered S.E.'s written police statement and the recording of her interview with the police into evidence. The State explained that it was offering the video recording to rebut Bump's accusation that S.E. made up the accusations so that she could live with KeKahuna. The trial court overruled Bump's objection and both the written and recorded statements were entered into evidence. Both of the previous statements contained the same allegations as those S.E. made on the stand.

{¶21} The State then called L.C. He testified that Bump made him watch pornographic movies and that after viewing the movies, Bump would touch his penis and perform oral sex on him. L.C. also stated Bump threatened him with a handgun and said that he would be forced into foster care if he ever told anyone else about the abuse.

{¶22} On cross-examination, L.C. said he had previously discussed the abuse allegations with S.E. After this admission, the following exchange occurred:

Q: Okay. If [S.E.] said sitting in that same chair that she never [talked to you about the abuse], would she be a liar?

Mr. Stewart [Prosecutor]: Objection. Calls for speculation.

The Court: Sustained. Counsel, let's approach.

\* \* \*

> The Court:   I don't want to hear anymore [sic] questions like that. This is a ten-year-old child, and you to come with – with the Dennis Lager kind of cross-examination is going to hold you in contempt. Trial Tr., p. 269.

After this admonishment, Bump's trial counsel elicited testimony regarding L.C.'s ability to remember events when he was two years old, which is when he alleged Bump started to abuse him:

> Q:   And you don't remember when you moved in with [Bump]?
>
> A:   I can't remember, I just – I can remember when we moved in with [Bump].  I just don't remember the date.
>
> Q:   And you were two years old?
>
> A:   Yeah.
>
> Q:   Do you remember when you were in diapers?
>
> A:   I can't remember that.
>
> Q:   Do you remember when you were potty trained?
>
> Mr. Stewart: Objection.  I don't see the relevance of this line of questioning.
>
> The Court:   Sustained.
>
> \* \* \*
>
> Q:   What else do you remember about when you were two years old?
>
> Mr. Stewart:  Objection, irrelevant.
>
> The Court:   Sustained.  Trial Tr., p. 270, 273.

-12-

**{¶23}** McKenzie Bumgarner, an investigator with the Logan County Department of Job and Family Services, then testified as to her involvement with the investigation of the allegations made by S.E. and L.C. She offered the following relevant testimony regarding the allegations made by S.E.:

> Q: Were there things – were there things about [S.E.'s] interview that were important to you in your investigation?
>
> A: Yes.
>
> Q: What kinds of things?
>
> A: The amount of details that she gave regarding the abuse that she was reporting. Just – I mean, when I interviewed her, she really was just able just to talk. I didn't have to ask a lot of questions. You know, for [S.E.] at 11 at that time, for her to give me the details and to tell that she wasn't allowed to use her teeth or she would get in trouble if she used her teeth or to describe what, you know, she wasn't sure what it was called, but semen, she was able to describe that in her terms. Trial Tr., p. 280-81.

After conducting the interview, Bumgarner proceeded to investigate the allegations and to arrange for the relocation of S.E. from Bump's residence. She also decided against sending S.E. to the hospital for a medical exam because S.E. indicated that the abuse occurred years before.

**{¶24}** Bumgarner then testified as to the interview of L.C. she conducted:

> Q: Was [L.C.] as forthcoming as [S.E.] was?
>
> A: He was. You could tell emotionally he was struggling at first, but he did tell us what was going on yes.

> \* \* \*

Q:   Okay.  Did you – do you remember asking him how old he was when [the abuse] started?

A:   Yes.

Q:   And he said something to you about it started when it was two.

A:   Correct.

Q:   Did you ask him any follow up about that?

A:   I think when [L.C.] – we asked him, you know, when the first time was, and said it was two.  We asked him when the last time was, and he said – I believe he said he was five.

* * *

Q:   Did [L.C.] also mention to you a video?

A:   Yes.

Q:   Did you ask him any follow-up questions about did you actually see [Bump's] face in the video?

A:   He did no – he didn't say anything about that with it being [Bump's] face, or – just that it was what they were doing; that he was watching stuff that they were doing on the film.  Trial Tr., p. 285-87.

Bump did not object to any of the above questioning at trial.  After discussing the interview, Bumgarner indicated that she talked with Carmen about getting therapy for L.C.  She also stated that the interview led her to conclude that L.C.'s safety was not threatened.

{¶25} Detective Salyer then took the stand to testify to the timeline and nature of the investigation he conducted.  He stated that S.E.'s allegations were

-14-

detailed which indicated that she was not coached to fabricate them. During his testimony, the State also played the recording of Detective Salyer's interview of Bump. In the recording, Detective Salyer stated that he found S.E.'s allegations to be credible and detailed. Bump did not object to the playing of the recording or to Detective Salyer's testimony that he found S.E.'s allegations to be detailed.

{¶26} The State finally called Betsy Linnell, a therapist with Mental Health Services for Clark County, who was proffered as an expert witness on the clinical counseling of children. She was responsible for assessing L.C.'s emotional state and preparing a mental health treatment plan for him. Linnell testified to the interview she conducted of L.C., including his statements regarding the abuse he suffered at Bump's hands and the threats that Bump made.

{¶27} During her initial interview, Linnell noted that L.C. had various physical and emotional manifestations from the abuse he suffered, including stomach pains, involuntary tremors, and anxiety. Linnell concluded that L.C. was suffering from Posttraumatic Stress Disorder ("PTSD"). She described the basis for the diagnosis as follows:

> Okay. [PTSD] has three main criterion. The first one is avoidance symptoms, the second one is recurrence symptoms, and the third one is reexperiencing type behaviors.
> [L.C.] has high scores on all three of these areas. He was experiencing flashbacks. He stated that he felt like things were happening again and he couldn't get it out of his head. He was not able to sleep in his own bedroom. He was actually not able to fall asleep very well at all, even with his mom right there with him. He was hypervigilant. Actually, while he was talking to me, he

-15-

> continued to look out the window behind him to make sure that nobody that shouldn't be pulling into our parking lot is pulling in. Because my office is right by the parking lot for our agency.
>
> I'm trying to like keep them in the right order. He also had a criterion where he would have difficulty with saying things to me, like continue his train of thought. He talked about the different frightening things that had been going on. He stated that the one time that he had come back to Bellefontaine at his birthday he was coming back to see his biological father and he had trouble even to drive into the city there. He had trouble if mom starts to talk about Bellefontaine, so he is trying to avoid things related to even the city or even talking about those events. Trial Tr., p. 398-99.

Linnell testified that after the initial interview, L.C. was hospitalized for suicidal ideation and that as a result, she developed a weekly therapy plan for his treatment.

{¶28} On cross-examination, Bump elicited testimony regarding the memory skills of two-year-old children. Linnell also confirmed that L.C. denied in her interview that Bump had forced anal penetration or oral sex on him. She also stated that the basis for her diagnosis was the interviews she conducted of both L.C. and Carmen as well as an emotional health test called the UCLA scale measurement. On redirect examination, Linnell testified that L.C.'s emotional symptoms are "extremely consistent" with child sexual abuse. Trial Tr., p. 411. She also indicated that the UCLA scale measurement was actually conducted by another person and that she was not involved in its administration. After Linnell's testimony, the State rested. Bump moved for a Crim.R. 29(A) acquittal, but the trial court denied the motion.

{¶29} Bump then presented his defense. KeKahuna testified that S.E. told her on various occasions that Bump hit her and the other children in the residence. She also indicated that S.E. never told her of any sexual abuse until April 17, 2010 and that when she heard of the allegations, she was "surprised." Trial Tr., p. 424-25. On cross-examination, she stated that S.E. was doing better emotionally, but that she "dissociates" from the abuse she allegedly suffered in that she describes it in the "third person." Trial Tr., p. 429-30. Bump then called one of the other children living in Bump's residence at the time of the purported sexual abuse. The child testified that he never saw Bump sexually abuse S.E. or L.C.

{¶30} Finally, Bump testified on his own behalf. He described the compactness of the residence he shared with L.C. and S.E. and the thinness of the walls. He also denied showing pornography to L.C. and S.E and engaging in any sex acts with the children.

{¶31} The trial concluded on January 26, 2012, and on January 27, 2012, the jury found Bump guilty on three counts of rape relating to the abuse of S.E., three counts of gross sexual imposition relating to the abuse of S.E., and one count of gross sexual imposition relating to the abuse of L.C. The jury found Bump not guilty on the count or rape relating to the abuse of L.C.

{¶32} On March 5, 2012, the trial court conducted a sentencing hearing in which it imposed a prison term of 19 years to life. At the hearing, the trial court did not inform Bump that it was imposing costs and attorney fees upon him.

However, the trial court's judgment entry of sentencing states that Bump "is ordered to pay the costs of prosecution and any fees permitted pursuant to Ohio Revised Code Sections 2929.18(A) and 2947.23." (Docket No. 145, p. 4).

{¶33} Bump filed this timely appeal, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS THE SEARCH OF THE RESIDENCE.**

### Assignment of Error No. II

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S SEVERANCE MOTION.**

### Assignment of Error No. III

**THE TRIAL COURT ERRED WHEN IT ADMITTED THE TESTIMONY OF LORNA CARMEN AND MCKENZIE BUMGARNER CONCERNING THE CONTENTS OF STATEMENTS MADE BY [S.E.] AND [L.C.].**

### Assignment of Error No. IV

**THE TRIAL COURT ERRED WHEN IT ADMITTED PRIOR STATEMENTS OF [S.E.] TO AS [SIC] AS SUBSTANTIVE EVIDENCE.**

### Assignment of Error No. V

**THE TRIAL COURT'S ADMISSION OF THE DETECTIVE'S OPINION TESTIMONY DEPRIVES APPELLANT OF A FAIR TRIAL.**

*Assignment of Error No. VI*

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED THE TESTIMONY CONCERNING THE CONTENTS OF APPELLANT'S COMPUTERS.**

*Assignment of Error No. VII*

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT LIMITED THE CROSS EXAMINATION OF [L.C.].**

*Assignment of Error No. VIII*

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED THE TESTIMONY OF BETSY LINNELL.**

*Assignment of Error No. IX*

**THE COMBINED EFFECT OF ALL THE ERRORS HEREIN DEPRIVED APPELLANT OF DUE PROCESS AND A FAIR TRIAL.**

*Assignment of Error No. X*

**THE TRIAL COURT ERRED WHEN IT IMPOSED COSTS AND ADDITIONAL FEES IN ITS SENTENCING ENTRY BECAUSE IT HAD NOT IMPOSED THESE SANCTIONS IN OPEN COURT AT THE SENTENCING HEARING.**

{¶34} Due to the nature of the assignments of error, we elect to address them out of order.

*Assignment of Error No. I*

{¶35} In his first assignment of error, Bump contends that the trial court inappropriately denied his motion to suppress evidence seized during the warrantless search of his house. Specifically, he suggests that the trial court

improperly found that Carmen had the requisite authority to consent to the search of the house. We disagree.

*Standard of Review for Motions to Suppress*

**{¶36}** "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of facts so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). The appellate court must then review the application of the law to the facts de novo. *Burnside* at ¶ 8.

*Consent Exception for Warrantless Searches*

**{¶37}** The Fourth Amendment to the United States Constitution, which is made applicable to the states via the Fourteenth Amendment, prohibits the state from conducting unreasonable searches and seizures.[1] "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a

---

[1] We note that the Ohio Constitution similarly protects against unreasonable searches and seizures. Ohio Constitution, Article I, Section 14; *State v. Robinette*, 80 Ohio St.3d 234, 245 (1997) (stating that Article I, Section 14 "affords protections that are coextensive with those provided by the Fourth Amendment [to the United States Constitution]").

warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371 (1980), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477, 91 S.Ct. 2022 (1971). The applicability of a "well-defined and carefully circumscribed" exception to the warrant requirement, however, obviates the unreasonableness that attaches to warrantless searches. *Roberts*, at ¶ 98, citing *Coolidge* at 454-55. This matter implicates the consent exception. Under this exception, a warrantless search is constitutionally permissible where a "third party who possesses common authority over the premises" voluntarily consents to the search. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793 (1990). In assessing the existence of common authority over the property, the United States Supreme Court has provided the following guidance:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that any of their number might permit the common area to be searched. (Citations omitted.) *United States v. Matlock*, 415 U.S. 164, fn. 7, 94 S.Ct. 988 (1974).

The burden to prove the applicability of the consent exception rests on the State. *Rodriguez* at 181.

{¶38} The consent exception still applies where the third party granting consent does not have actual authority over the searched premises provided that

the police officers conducting the search had a reasonable belief that the third party had such authority. *Id.* at 188-89; *see also Georgia v. Randolph*, 547 U.S. 103, 106, 126 S.Ct. 1515 (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained"). Such reasonable belief exists if "the facts available to the officer at the moment [of the search would] warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises[.]" (Citation omitted.) *Rodriguez* at 188.

*Reasonableness of the Police's Belief that Carmen Had Authority*

{¶39} Here, the consenting party was Carmen. A review of the record reveals that it is a close call whether the police had a reasonable belief that Carmen had authority over Bump's residence at the time of the search. But, based on all the evidence adduced at the suppression hearing, we find that the police did have such a reasonable belief regarding Carmen's authority.

{¶40} At the suppression hearing, Carmen testified that she informed the police on April 17, 2010 that she had lived at Bump's residence for several years off and on, but that after S.E. disclosed her allegations, she had decided to go stay elsewhere with a relative. Carmen also informed the police that she had taken some of her personal items from Bump's residence. But, there is no indication

that Carmen informed the police on April 17, 2010 that her intent was to permanently move from Bump's residence or that she had removed all of her possessions. Indeed, Carmen even listed the address of Bump's residence as her own when she made her police statement.

{¶41} Further, Carmen's possession of a key and the presence of possessions at Bump's residence on the date of the search are relevant to the reasonableness of the police's belief regarding her authority. *E.g.*, *State v. McCartney*, 12th Dist. No. CA2003-09-020, 2004-Ohio-4781, ¶ 17 (finding that police had reasonable belief that third party had authority over the searched premises where the third party had key to the property and possessions at the property). Detective Salyer indicated that he saw Carmen with a key to the property and the evidence suggests that the police knew that Carmen still had possessions there. In light of this evidence, we are unable to find that the belief by the police that Carmen had authority over Bump's residence was unreasonable.

{¶42} Despite this finding, we are compelled to address Detective Salyer's testimony that he believed Carmen had authority to consent to the search because she was not evicted from Bump's residence at the time of the search. We are unable to see how a reasonable person would consider the lack of an eviction as an indication that a third party continued to have authority over the property. Such an erroneous belief discounts the possibility of individuals voluntarily moving out of a residence. We also note that it would have been the better practice for the State

-23-

to obtain a search warrant. There was a four day period between Bump's arrest and the search of his residence.[2] During that time, a search warrant could have been obtained with minimal effort.

**{¶43}** Based on the foregoing, we find that the trial court did not err in denying Bump's motion to suppress.

*Harmless Error*

**{¶44}** Even if the trial court's denial of the motion to suppress was erroneous, we would still find that such error was harmless. The State adduced evidence at trial that was overwhelmingly sufficient to establish the elements of rape and gross sexual imposition in the counts relating to S.E. and of gross sexual imposition relating to L.C. Both S.E. and L.C. testified in extensive detail as to the abuse they allegedly suffered. Carmen testified that due to their conflicting work schedules, Bump was alone with the children on many occasions and had the opportunity to abuse them. Additionally, Carmen testified that both children were acting differently around the time that they reported the abuse while Linnell's testimony established that L.C. experienced psychological harm usually associated with sexual abuse, including the onset of PTSD. Further, according to Bumgarner, S.E. and L.C. described sexual abuse that one would not expect such young children to know or understand.

---

[2] We further note that Detective Salyer testified at the suppression hearing that he did not ask Bump for his consent to search the premises during his police interview on April 17, 2010.

{¶45} Meanwhile, the computers obtained during the search were inconsequential to the trial's outcome. The contents of the computers merely corroborated both S.E.'s and L.C.'s testimony that Bump forced them to watch pornographic materials before engaging in sex acts with them. Absent the evidence, the jury still would hear S.E.'s and L.C.'s consistent testimony about Bump's showing of pornographic materials.

{¶46} Accordingly, we overrule Bump's first assignment of error.

*Assignment of Error No. VI*

{¶47} In his sixth assignment of error, Bump asserts that the trial court erroneously admitted testimony regarding the contents of his home computers. Specifically, he claims that the evidence should have been excluded as unfairly prejudicial. Our resolution of Bump's first assignment of error renders this assignment of error moot and we decline to address it. *See* App.R. 12(A)(1)(c).

*Assignment of Error No. II*

{¶48} In his second assignment of error, Bump asserts that the trial court erred in denying his motion to sever the trial of the counts relating to S.E. from the trial of the counts relating to L.C. We disagree.

*Standard of Review*

{¶49} We review a trial court's decision to deny or grant a motion to sever for abuse of discretion. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 49. A trial court will be found to have abused its discretion when its decision is

contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶ 16-18, citing *Black's Law Dictionary* 11 (8th Ed.2004). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Nagle*, 11th Dist. No. 99-L-089 (June 16, 2000), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*Standard for Severance*

{¶50} Crim.R. 8(A) authorizes joinder of multiple criminal charges where the charges "are of the same or similar character, or are based on the same act or transaction, or are based on two acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In applying Crim.R. 8(A), we note that "the law favors joinder." *State v. Waddy*, 63 Ohio St.3d 424, 429 (1992), superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). Even if charges are properly joined under Crim.R. 8(A), a defendant may still seek severance of the charges pursuant to Crim.R. 14, which provides as follows: "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * *, the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires."

{¶51} To establish error in a trial court's denial of a motion to sever, a defendant "has the burden of affirmatively showing that his rights were prejudiced

by the joinder." *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶ 26, citing *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. In assessing the existence of such prejudice, a reviewing court must determine "(1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). Moreover, "[i]f evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id*., quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir.1964).

*Other Acts Evidence*

**{¶52}** The first prong of the *Schaim* analysis here implicates R.C. 2945.59 and Evid.R. 404(B). Both proscribe the admission of other crimes and bad acts for the purpose of showing the defendant's propensity to commit crimes or that he acted in conformity with bad character traits. R.C. 2945.59; Evid.R. 404(B). However, both R.C. 2945.59 and Evid.R. 404(B) also provide for various contexts in which other acts evidence is admissible. For instance, R.C. 2945.59 states that "[i]n any criminal case in which the * * * defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show * * * the defendant's scheme, plan, or system in doing the act in question may be proved * * *." Evid.R. 404(B) similarly indicates that bad acts evidence is admissible to

prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Supreme Court of Ohio has harmonized its interpretation of these two provisions. *See State v. Williams*, Slip Opinion No. 2012-Ohio-5695, syllabus ("Evid.R. 404(B) is in accord with R.C. 2945.59 in that it precludes the admission of evidence of other crimes, wrongs, or acts offered to prove the character of an accused in order to show that the accused acted in conformity therewith, but it does not preclude admission of that evidence for other purposes."). The Court has also noted that Evid.R. 404(B) "afford[s] broad discretion to the trial judge regarding the admission of other acts evidence." *Id*. at ¶ 17.

{¶53} The Court's decision in *Williams* provides significant guidance to this matter. There, the defendant was charged with various crimes, including rape and gross sexual imposition, arising from his alleged sexual abuse of a minor. The State offered evidence of the defendant's previous sexual abuse of another minor. The previous victim showed similar characteristics with the current victim in that both did not have active relationships with their fathers. The defendant then filled that void in the victims' lives so that he could sexually exploit them. Based on these facts, the Court reinstated the trial court's order allowing the evidence because it showed "the plan of the accused" to "gain [the victims'] trust and confidence" before abusing them. As a result, the evidence was admissible under R.C. 2945.59 and Evid.R. 404(B). *Id*. at ¶ 25.

{¶54} Here, if the counts relating to S.E. were severed from the counts relating to L.C., then the evidence of the abuse L.C. suffered would be admissible in the trial of the counts relating to S.E.'s. The fathers of both S.E. and L.C. are almost entirely absent from their lives. Bump, meanwhile, was the father figure in both S.E.'s and L.C.'s lives at the time of the alleged abused. Both lived in his house for several years and indeed, S.E. even called Bump "Dad." Bump used this familial-type relationship to expose both children to pornographic materials and then to exploit them sexually. Under the *Williams* court's interpretation of R.C. 2945.59 and Evid.R. 404(B), these similarities would render the evidence of L.C.'s abuse admissible to show Bump's common scheme or plan to act as a father to vulnerable children and then sexually exploit them. Further, the same result, as it relates to the admission of evidence regarding the abuse suffered by S.E., would occur in the trial of the counts involving L.C. As such, we find that R.C. 2945.59 and Evid.R. 404(B) would render the evidence of both S.E.'s and L.C.'s abuse admissible in severed trials.

{¶55} Since the evidence of the other acts would be admissible in the severed trials, we need not consider the second prong of the *Sciam* analysis and we consequently find that it was not an abuse of discretion for the trial court to deny Bump's motion to sever.

{¶56} Accordingly, we overrule Bump's second assignment of error.

*Assignment of Error No. III*

**{¶57}** In his third assignment of error, Bump maintains that the trial court erroneously admitted the testimony of Carmen and Bumgarner regarding the out-of-court statements made by S.E. and L.C. Specifically, Bump argues that the out-of-court statements constitute impermissible hearsay that is not covered by the excited utterance exception. We agree, but find no prejudicial error to Bump.

**{¶58}** Hearsay is "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Evid.R. 802 generally prohibits the admission of hearsay unless the hearsay statement is covered by a specific exception.

**{¶59}** This matter implicates the excited utterance exception, which permits the introduction of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). For a statement to satisfy Evid.R. 803(2)'s excited utterance exception, the following four elements must be present:

> (1) the event must be startling enough to produce a nervous excitement in the declarant;
> (2) the statement must have been made while the declarant was still under the stress of the excitement caused by the event;
> (3) the statement must relate to the startling event; and
> (4) the declarant must have personally observed the startling event.
> *State v. Tebelman*, 3d Dist. No. 12-09-01, 2010-Ohio-481, ¶ 27, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-01 (1993).

Further, "[t]he controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *State v. Humphries*, 79 Ohio App.3d 589, 598 (12th Dist. 1992).

{¶60} We have liberally applied the excited utterance exception in cases involving child declarants who allege sexual abuse. *E.g.*, *State v. Gutierrez*, 3d Dist. No. 5-10-14, 2011-Ohio-3126, ¶ 46. The reasoning for our liberal application is that "statements made by young children are more trustworthy than those made by adult declarants because of their limited ability to reflect on past incidents." *State v. Bradley*, 3d Dist. No. 15-10-03, 2010-Ohio-5422, ¶ 38. Accordingly, we are more willing to admit out-of-court statements as excited utterances in child sex cases even though the time period between the child's out-of-court statement and the startling impetus is longer than what would be allowed in matters involving an adult declarant. *Id.* Indeed, "[t]he focus is not on a specific time frame but upon whether the excitement of the assault is still dominant on the child declarant's thought processes and whether the child's statements were unreflective expressions of her belief." *State v. Fox*, 66 Ohio App.3d 481, 489 (6th Dist. 1990), citing *State v. Wallace*, 37 Ohio St.3d 87, 93 (1988).

*Carmen's Testimony Regarding S.E.'s Statements*

{¶61} Bump objected to the admission of Carmen's testimony about S.E.'s out-of-court statements. Consequently, we review the trial court's admission of the testimony for an abuse of discretion. *State v. Heft*, 3d Dist. No. 8-09-08, 2009-Ohio-5908, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001).

{¶62} To resolve whether Carmen's testimony regarding S.E.'s statements was properly admitted, we must determine whether S.E. was under the stress of Bump's abuse when she made her statements to Carmen. There is some evidence suggesting that S.E. was still under the stress of the abuse when she made the statements. Carmen testified that S.E. was acting differently in the days before making her statements and was "depressed." Trial Tr., p. 123. Further, S.E. "blurted" the statements, and she did not have "time to think about what she was going to say." Trial Tr., p. 124.

{¶63} Conversely, there is other evidence indicating that S.E. was not under the stress of the abuse when she made her statements. S.E.'s statements relate to abuse that she had suffered years beforehand, which suggests that the excited utterance exception does not apply. *E.g.*, *State v. Harr*, 158 Ohio App.3d 704, 2004-Ohio-5771, ¶ 140 (2d Dist.) (finding that excited utterance exception did not apply to testimony regarding child declarant's out-of-court statement made two weeks after suffering alleged abuse). Additionally, Carmen did not indicate that S.E. was crying or emotional during the course of her statements regarding the

abuse she suffered, which also suggests that S.E.'s statements are not excited utterances. *Compare Bradley*, 2010-Ohio-5422, at ¶ 38-39 (finding that child declarant's out-of-court statements were admissible as excited utterances where she was excited and crying when she made them) *with State v. Hazlett*, 3d Dist. No. 8-06-04, 2006-Ohio-6927, ¶ 29 (finding that child declarant's out-of-court statements were not admissible as excited utterances where declarant was not crying at time that she made statements). Also, S.E. made her statements to Carmen after discussing a variety of other topics, suggesting that they were made in the context of a normal conversation. *In re Joshua C.*, 6th Dist. No. E-03-015, 2003-Ohio-6752, ¶ 15 (finding that child declarant's out-of-court statement was not admissible as excited utterance where it was made during casual conversation).

{¶64} Due to the long period between the abuse and S.E.'s statements as well as the lack of evidence indicating that S.E. was crying or emotionally upset when making her statements, we find that S.E. was not under the stress of Bump's abuse when she made her statements. Consequently, we find that S.E.'s out-of-court statements are not covered by the excited utterance exception and that the trial court abused its discretion in allowing Carmen to testify regarding those statements.

{¶65} Since the trial court improperly admitted Carmen's testimony regarding S.E.'s out-of-court statements, we must turn to the prejudice that resulted to Bump as a result of the admission. The admission of improper hearsay

-33-

evidence is disregarded as harmless error if it "does not affect substantial rights." Crim.R. 52(A). Substantial rights are not affected "where the remaining evidence constitutes overwhelming proof of a defendant's guilt * * *." *State v. Jones*, 3d Dist. No. 15-11-16, 2012-Ohio-5334, ¶ 34, citing *State v. Murphy*, 91 Ohio St.3d 516, 555 (2001); *see also State v. Brown*, 65 Ohio St.3d 483, 485 (1992) (stating that harmless error exists if there is no reasonable probability that the error affected the trial's outcome). In the context of a child's out-of-court statement regarding sexual abuse, we have recognized that "[w]here a declarant is examined on the same matters as [those] contained in an impermissible hearsay statement and where the testimony is essentially cumulative, the admission of such hearsay statement is harmless." *Gutierrez*, 2011-Ohio-3126, at ¶ 50.

{¶66} Here, S.E. was called to testify and subject to cross-examination by Bump. In her testimony, S.E. recounted the same allegations as those covered in Carmen's testimony about S.E.'s out-of-court statements. Based on this, Carmen's testimony was merely duplicative of S.E.'s testimony, and even without Carmen's testimony, the jury would still hear S.E.'s detailed description of the abuse she suffered. As such, we find that the improper admission of Carmen's testimony regarding S.E.'s hearsay statements was harmless.

*Carmen's Testimony Regarding L.C.'s Statements*

{¶67} Although Bump filed a motion in limine to exclude Carmen's testimony regarding L.C.'s out-of-court statements, he did not object to the

testimony once it was adduced at trial. Such a failure to object operates as a waiver of all but plain error. *See State v. Leslie*, 14 Ohio App.3d 343, 344 (2d Dist. 1984) ("An order granting or denying a motion in limine is a tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated. An appellate court need not review the propriety of such an order unless the claimed error is properly preserved by a timely objection when the issue is actually raised during trial."); *see also State v. Brit*, 3d Dist. No. 8-86-4 (July 30, 1987) (applying *Leslie*'s reasoning). To have plain error under Crim.R. 52(B), the error must be an "obvious" defect in the trial proceedings and must have affected "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. Such error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431 (1997).

{¶68} As with Carmen's testimony regarding S.E.'s disclosure, we have to resolve whether L.C. was still under the stress of Bump's abuse when he made his out-of-court statements to Carmen. Carmen testified that L.C. was enduring stomach pain, sleeping problems, and nightmares in the two months after they moved out of Bump's residence. On the night that L.C. disclosed the abuse to Carmen, he had just awakened from a nightmare and told his mother that he wanted to be close to her, which indicates an emotional vulnerability that we have

previously found to support an excited utterance finding. *E.g.*, *Bradley*, 2010-Ohio-5422, at ¶ 39 (finding that excited utterance exception applied to child declarant's out-of-court statement where the declarant did not want to leave the side of her mother when making statement about sexual abuse). In light of this detailed testimony regarding L.C.'s distress at the time of his statements, it appears that L.C. was still under the stress of Bump's abuse when he made his statements to Carmen.[3] Consequently, we find that it was not plainly erroneous for the trial court to allow Carmen's testimony regarding L.C.'s statements.

*Bumgarner's Testimony Regarding S.E.'s and L.C.'s Statements*

{¶69} Although Bump's motion in limine sought the exclusion of Bumgarner's testimony as to S.E.'s and L.C.'s out-of-court statements, he did not object to the admission of the evidence at trial. Accordingly, Bump has waived all but plain error. *Leslie*, 14 Ohio App.3d at 344.

{¶70} A review of Bumgarner's testimony reveals that S.E.'s and L.C.'s out-of-court statements were not offered to prove the truth of the matter asserted. Bumgarner testified that based on her experience as an investigator of child abuse, she considered S.E.'s and L.C.'s statements regarding the alleged abuse to be more detailed than what would be expected for young children. Further, she referred to S.E.'s and L.C.'s statements within the context of describing the subsequent timeline and nature of her investigatory and response activities. As a result, we

---

[3] We note that the detailed testimony regarding L.C.'s distress is much different from Carmen's bald assertion that S.E. was depressed before making her out-of-court statements.

find that S.E.'s and L.C.'s out-of-court statements to Bumgarner were not impermissible hearsay and that the trial court did not plainly err in allowing Bumgarner to testify regarding them.[4] *See State v. Thomas*, 61 Ohio St.2d 223, 232 (1980) ("The testimony at issue was offered to explain the subsequent investigatory activities of the witnesses. It was not offered to prove the truth of the matter asserted.").

{¶71} In sum, it was erroneous for the trial court to admit Carmen's testimony regarding S.E.'s out-of-court statements, but the error was harmless and does not give rise to a reversal. Further, the trial court did not plainly err in admitting Carmen's testimony as to L.C.'s out-of-court statements or Bumgarner's testimony regarding S.E.'s and L.C.'s out-of-court statements.

{¶72} Accordingly, we overrule Bump's third assignment of error.

*Assignment of Error No. IV*

{¶73} In his fourth assignment of error, Bump asserts that the trial court erred in admitting S.E.'s prior written and recorded statements to law enforcement regarding the alleged sexual abuse she suffered. Specifically, Bump claims that the previous statements were not offered to rebut a charge of recent fabrication and consequently were not admissible. We agree, but find no prejudicial error.

---

[4] We note that Bump did not request, and the trial court did not issue, a limiting instruction as to the proper use of Bumgarner's testimony regarding S.E.'s and L.C.'s statements.

**{¶74}** We review the trial court's admission of this evidence for an abuse of discretion. *Heft*, 2009-Ohio-5908, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001).

**{¶75}** Evid.R. 801(D)(1)(b) provides that an out-of-court statement is not hearsay if "[t]he declarant testifies at trial or hearing, and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive * * *." Prior consistent statements are not admissible under this hearsay exemption "to counter all forms of impeachment or to bolster [a] witness merely because she has been discredited." *Tome v. United States*, 513 U.S. 150, 158, 115 S.Ct. 696 (1995). As a result, the question is "not whether [the out-of-court statements] suggested that the declarant's in-court testimony was true," but is instead "whether the out-of-court statements rebutted the alleged motive to falsify testimony or the improper influence * * *." *State v. Bleigh*, 5th Dist. No. 09-CAA-03-0031, 2010-Ohio-1182, ¶ 82. Thus, for an out-of-court statement to rebut an alleged motive to falsify testimony, the out-of-court statement must have been made before the alleged motive arose. *See State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, ¶ 56 (6th Dist.) ("[Evid.R. 801(D)(1)(b)] contains a timing component for prior statements in relation to a charge of 'improper motive.' That is, only prior consistent statements made *before* the alleged motive to fabricate arose are

admissible. The issue is not when the charge was made, but when the improper motive arose."); *State v. Smith*, 34 Ohio App.3d 180, 191 (5th Dist. 1986) ("The point is that the facts giving rise to the motive to falsify existed *before* the disputed consistent statements.")

{¶76} Here, the State indicated to the trial court that S.E.'s written and recorded statements were offered to rebut Bump's defense that she fabricated the abuse accusations so that she could live with her mother. On appeal, the State also says that the evidence rebutted Bump's defense that the accusations were fabricated because Bump physically disciplined S.E. But, a review of the record reveals that S.E. had a desire to live with her mother and that Bump had physically disciplined her before she gave the written and recorded statements. As such, S.E.'s written and recorded statements do not qualify as prior consistent statements under Evid.R. 801(D)(1)(b) and the trial court erred in admitting them.

{¶77} Although the trial court should not have admitted the written and recorded statements, a review of the record establishes that the error was harmless. The statements merely duplicated the same allegations of abuse that S.E. had already testified to on the stand. In light of the duplicative nature of the statement and the other overwhelming evidence to establish the crimes charged, we find no reversible error.

{¶78} In sum, the trial court erred in admitting S.E.'s written and recorded statements to the police because they do not fall under the purview of Evid.R.

801(D)(1)(b). Still, the trial court's errors are harmless and do not provide grounds for reversal.

**{¶79}** Accordingly, we overrule Bump's fourth assignment of error.

*Assignment of Error No. V*

**{¶80}** In his fifth assignment of error, Bump maintains that the trial court improperly admitted Detective Salyer's testimony that S.E.'s allegations were credible. Specifically, he claims that such testimony is impermissible opinion testimony. We agree, but find no prejudicial error.

**{¶81}** Bump did not object to any of Detective Salyer's testimony regarding the credibility of S.E.'s allegations. Accordingly, he has waived all but plain error. *State v. Cunningham*, 11th Dist. No. 2007-L-034, 2008-Ohio-1127.

**{¶82}** The State did not offer Detective Salyer as an expert witness, so Evid.R. 701 controls our review. Evid.R. 701 governs lay opinion testimony and it limits such testimony to "those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." We have previously recognized that "there is well-established Ohio precedent that generally prohibits the use of opinion testimony regarding a witness' untruthfulness." *State v. Muller*, 3d Dist. No. 4-11-09, 2012-Ohio-3530, ¶ 62; *see also State v. Boston*, 46 Ohio St.3d 108, 128 (1989) ("[I]t is the fact finder, and not the so-called expert or lay witnesses, who bear the burden of assessing the credibility and veracity of

witnesses."), modified on other grounds by *State v. Dever*, 64 Ohio St.3d 401 (1992).

**{¶83}** Here, Detective Salyer did testify that he found S.E.'s allegations to be credible. Such testimony is not permissible. However, courts have found that such error may be harmless when the child declarant who experienced the purported sexual abuse testifies. *E.g.*, *State v. Djuric*, 8th Dist. No. 87745, 2007-Ohio-413, ¶ 43-44 (finding that admission of detective's opinion testimony that allegations of the child sex abuse victim were credible was erroneous but harmless because the victim testified at trial and was subject to cross-examination); *State v. Benjamin*, 8th Dist. No. 87364, 2006-Ohio-5330, ¶ 16 (finding that admission of doctor's opinion testimony that allegations of the child sex abuse victim were "uncoached" was harmless because the victim testified and was subject to cross-examination); *State v. Curren*, 5th Dist. No. 04 CA 8, 2005-Ohio-4315, ¶ 26 (finding that admission of social worker's testimony that the allegations of child sex abuse victim were substantiated was harmless because the victim testified and was subject to cross-examination). Here, S.E. testified at length and she was subjected to vigorous cross-examination by Bump's trial counsel. The jurors were able to observe her demeanor and could assess her credibility on their own. Consequently, we find no prejudicial error in the trial court's erroneous admission of Detective Salyer's testimony.

{¶84} We also note that most of the portions in the trial transcript cited by Bump as containing impermissible opinion testimony refer to the audio recording of Bump's interview by Detective Salyer.  Under *State v. Kidder*, 32 Ohio St.3d 279 (1987), the admission of Detective Salyer's statements in this context is harmless because the statements were made while he was attempting to elicit further information from Bump in the course of a police interrogation.  *Id*. at 285 ("[T]he jury was fully aware of the context in which the inadmissible hearsay and opinion statements of the police were made: the officers were engaged in an interrogation of a criminal suspect.  In this context, the impact on the average jury would have been much less than the same statements made by a police officer on the witness stand at trial.").

{¶85} In sum, the trial court improperly admitted Detective Salyer's testimony that S.E.'s allegations were credible.  However, the error was harmless since S.E. testified at trial.

{¶86} Accordingly, we overrule Bump's fifth assignment of error.

*Assignment of Error No. VII*

{¶87} In his seventh assignment of error, Bump argues that the trial court improperly limited the cross-examination of L.C. under both Evid.R. 611 and the Sixth Amendment's guarantee of the right to confront witnesses.  We disagree.

{¶88} We review a trial court's order pursuant to Evid.R. 611 for abuse of discretion.  *State v. Watson*, 3d Dist. No. 14-09-01, 2009-Ohio-6713, ¶ 41.  Under

Evid.R. 611(A), the trial court is empowered to control the presentation of evidence, including the "mode and order of interrogative witnesses * * * so as to (1) make the interrogation * * * effective for the ascertainment of the truth, * * * and (3) protect witnesses from harassment or undue embarrassment." When exercising this discretion, the trial court should be mindful that cross-examination is allowable "on all relevant matters and matters affecting credibility." Evid.R. 611(B).

{¶89} Based on its subject matter, Evid.R. 611's dictates also implicate Confrontation Clause concerns. The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Among the most vital rights guaranteed under this clause is the right of criminal defendants to cross-examine witnesses at trial. *Cruz v. New York*, 481 U.S. 186, 189, 107 S.Ct. 1714 (1987). While "the Sixth Amendment guarantees an opportunity for effective cross-examination," it does not require trial courts to allow "cross-examination * * * in whatever way and, to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292 (1985); *see also State v. Freeman*, 7th Dist. No. 07 JE 5, 2008-Ohio-2925, ¶ 11 ("[A] criminal defendant's right to confront and cross-examine a witness is not unlimited."). "Rather, a trial court retains wide latitude under the Confrontation Clause to impose reasonable limits on cross-examination" resulting from

considerations of "harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant." *State v. Williams*, 7th Dist. No. 09 MA 11, 2010-Ohio-3279, ¶ 18, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431 (1986).

*The Trial Court's* Sua Sponte *Limitation of the Cross-Examination*

{¶90} Bump first challenges the following limitation of his cross-examination of L.C.:

> Q:   Okay.  If [S.E.] said sitting in that same chair that she never [talked to you about the abuse], would she be a liar?
>
> Mr. Stewart [Prosecutor]: Objection.  Calls for speculation.
>
> The Court:    Sustained.  Counsel, let's approach.
>
> * * *
>
> The Court:    I don't want to hear anymore [sic] questions like that. This is a ten-year-old child, and you to come with – with the Dennis Lager kind of cross-examination is going to hold you in contempt. Trial Tr., p. 269.

He contends that this limitation precluded him from developing the discrepancies between S.E.'s and L.C.'s testimonies as they relate to their previous discussions of Bump's alleged abuse.  After reviewing the record, we find that the limitation did not have such a preclusive effect.

{¶91} Before Bump asked this question, L.C. had already testified that he had never discussed the abuse with S.E.  Immediately before L.C.'s testimony, S.E. testified to the contrary.  Reasonable jurors could plainly determine that there

-44-

was a discrepancy between L.C.'s version and S.E.'s version based simply on the contradictory testimony. They did not need to hear L.C.'s answer to the loaded question of whether S.E. was a liar and there was no need for Bump's trial counsel to further develop the existence of this inconsistency. Further, even if Bump's trial counsel needed to further develop the inconsistency, he did not need to use such inflammatory language, especially when cross-examining a 10-year-old child. Indeed, the trial court's admonishment did not preclude Bump's trial counsel from rephrasing his question or asking it in a less speculative way. *See State v. Leyman*, 9th Dist. No. 2970-M (Oct. 4, 2000) (finding no Confrontation Clause violation in trial court's limitation cross-examination since defense counsel could rephrase question). As a result, we find that the trial court did not abuse its discretion in limiting the cross-examination of L.C. regarding the discrepancies between his and S.E.'s testimonies.

*Cross-Examination Regarding L.C.'s Memory Skills*

{¶92} Bump also challenges the following limitations of his defense counsel's cross-examination of L.C.:

Q: And you don't remember when you moved in with [Bump]?

A: I can't remember, I just – I can remember when we moved in with [Bump]. I just don't remember the date.

Q: And you were two years old?

A: Yeah.

Q: Do you remember when you were in diapers?

A: I can't remember that.

Q: Do you remember when you were potty trained?

Mr. Stewart: Objection. I don't see the relevance of this line of questioning.

The Court: Sustained.

* * *

Q: What else do you remember about when you were two years old?

Mr. Stewart: Objection, irrelevant.

The Court: Sustained. Trial Tr., p. 270, 273.

These questions focused on L.C.'s ability to remember the alleged abuse he suffered when he was two years old. Since L.C. said that Bump's abuse of him started when he was that age, this was an appropriate area for cross-examination.

{¶93} In the course of this questioning, L.C. had already admitted that he could not remember the exact day that he moved in with Bump. When Bump's trial counsel then veered into discussing embarrassing items, such as the wearing of diapers and potty training, the trial court stopped the cross-examination upon the State's objection. This is proper under both Evid.R. 611 and the Confrontation Clause, Evid.R. 611(A); *Williams*, 2010-Ohio-3279, at ¶ 18, citing *Van Arsdall*, 475 U.S. at 679, especially since "[t]he protection of children from undue trauma when testifying is an important public policy goal," *State v. Presley*, 10th Dist. No.

02AP-1354, 2003-Ohio-6069, ¶ 45. As a result, we do not find that the trial court abused its discretion in limiting the cross-examination of L.C. regarding his memory skills.

{¶94} Further, even if the trial court's limitation in this regard was erroneous, the error would be harmless. Bump's trial counsel elicited information from Linnell regarding the memory skills of two-year old children. Additionally, before addressing the topics of diapers and potty training, Bump's trial counsel had already shown that L.C. was unable to remember details from when he was two-years old.

{¶95} Accordingly, we overrule Bump's seventh assignment of error.

*Assignment of Error No. VIII*

{¶96} In his eighth assignment of error, Bump asserts that the trial court erred in admitting Linnell's testimony. In particular, Bump argues that Linnell testified to improper hearsay evidence and that her testimony violated his right to confront witnesses under the Sixth Amendment. We disagree.

*Evid.R. 803(4)*

{¶97} Although Bump's motion in limine sought the exclusion of Linnell's testimony as to L.C.'s out-of-court statements, he did not object to the admission of the evidence at trial. Accordingly, Bump has waived all but plain error. *Leslie*, 14 Ohio App.3d at 344.

{¶98} Evid.R. 803(4) provides that hearsay statements are admissible if they are "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof as reasonably pertinent to diagnosis or treatment." To determine the applicability of Evid.R. 803(4), "the primary inquiry is whether the statements were made for purposes of *medical* diagnosis or treatment, as opposed to some other purpose." *Bradley*, 2010-Ohio-5422, at ¶ 48. We have recognized that "[a]ny error in the admission of hearsay is generally harmless when the declarant is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature." *State v. Geboy*, 145 Ohio App.3d 706, 721 (3d Dist. 2001).

{¶99} Regardless of whether the statements made by L.C. to Linnell were admissible pursuant to Evid.R. 803(4),[5] we find that any potentially erroneous admission of the evidence was harmless. L.C. testified to the allegations of sexual abuse he made and Bump was able to cross-examine him as to those allegations. Accordingly, Linnell's testimony as to L.C.'s out-of-court allegations was cumulative and does not provide grounds for a reversal.

*Confrontation Clause*

{¶100} The United States Supreme Court has stated "[w]here testimonial evidence is at issue, * * * the Sixth Amendment demands what the common law

---

[5] This author questions whether L.C.'s statements to Linnell, a therapist, could fall under Evid.R. 803(4). Since Linnell is a therapist, she could not have been providing *medical* treatment or diagnosis.

required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354 (2004). Although the Court did not define "testimonial," it did indicate that the term includes those statements made "'under circumstances which would lead an objective witness [to] reasonably believe that the statement would be available for use at a later trial.'" *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, paragraph one of the syllabus, quoting *Crawford* at 52. Here, Bump complains that the admission of Linnell's testimony violated the Confrontation Clause because she partially based her diagnosis of PTSD on the UCLA scale measurement, which was conducted by another person who was not called to testify.

{¶101} A review of the United States Supreme Court's recent case law on the Confrontation Clause's effect on the admissibility of scientific results at trial is necessary to resolve this matter. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527 (2009), the Court addressed a criminal case in which the defendant was tried for trafficking in narcotics. The police seized various bags containing white powder and submitted them for chemical testing. The analyst who tested the substances prepared an affidavit in which he opined that the substances were cocaine. The Court held that the affidavit was testimonial because it was created solely for use at trial and that its admission without the opportunity to cross-examine the analyst violated the Confrontation Clause. *Id.* at 321-22, 329.

{¶102} The Court then addressed the same issue in *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), which involved a prosecution for driving under the influence of alcohol. There, the prosecution offered testimony from the supervisor of the laboratory where the defendant's blood alcohol content was tested. The supervisor did not conduct the tests and the analyst who did was not called to testify at trial. The Court held such "surrogate testimony" violated the Confrontation Clause. *Id*. at 2710. Accordingly, the Court stated that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Id*. at 2715, quoting *Melendez-Diaz* at fn. 6.

{¶103} The Court's most recent attempt to clarify its interpretation of the Confrontation Clause came in *Williams v. Illinois*, 132 S.Ct. 2221 (2012). In *Williams*, the Court found that an expert witness' disclosure that she relied on a report generated by another analyst in reaching her conclusion did not violate the Confrontation Clause. The Court advanced two reasons for its holding.[6] First, the report was not offered for the truth of the matter asserted, but rather to merely explain the expert's reasons for her conclusion. *Id*. at 2241 (plurality opinion of Alito, J.). Second, the purpose of preparing the report was not to use it at trial

---

[6] We note that the *Williams* Court was fractured regarding the reasoning to find that no Confrontation Clause violation occurred. *See Williams*, 132 S.Ct. at 2265 (Kagan, J., dissenting) (noting that five votes supported finding no Confrontation Clause violation "but [that] not a single good explanation" was present in the plurality or concurring opinion for such a finding).

against the defendant, which the Court noted was a material difference between *Williams* and *Bullcoming*. *Id*. at 2243-44.

**{¶104}** We find this matter to be more analogous to *Williams* than to *Melendez-Diaz* and *Bullcoming*. Unlike the supervisor who testified in *Bullcoming*, Linnell was intricately involved in the psychological and emotional assessment of L.C. She was not the mere surrogate for the testimony of the person who conducted the UCLA scale measurement. *See State v. Zimmerman*, 8th Dist. No. 96210, 2011-Ohio-6156, ¶ 45-46 (distinguishing *Bullcoming* and finding no Confrontation Clause violation where expert witness based his opinion both on his own observations as well as the observations of another doctor who did not testify). Further, unlike *Melendez-Diaz*, the UCLA scale measurement was not prepared to implicate Bump as guilty of sexual abuse. Rather, Linnell's testimony indicates that the test was administered so that Linnell and other mental health professionals could develop a treatment plan for L.C.'s PTSD and other psychological ailments. *Compare State v. Ellis*, 4th Dist. No. 11CA3, 2012-Ohio-1022, ¶ 12 (finding that *Melendez-Diaz* applied and that Confrontation Clause was violated where urine test was administered so that the State could use results at trial against defendant charged with OVI). The testimony also indicates that, as in *Williams*, Linnell merely testified to the UCLA scale measurement results when describing the various reasons for her diagnosis of PTSD. As a result, we find that

Linnell's testimony regarding the UCLA scale measurement did not violate the Confrontation Clause.

{¶105} In sum, any erroneous admission of Linnell's testimony regarding L.C.'s out-of-court statements to her was harmless. Further, Linnell's testimony regarding the UCLA scale measurement did not violate Bump's confrontation rights.

{¶106} Accordingly, we overrule Bump's eighth assignment of error.

*Assignment of Error No. X*

{¶107} In his tenth assignment of error, Bump contends that the trial court improperly imposed court costs and attorney fees because it did not address those items at the sentencing hearing. We agree.

{¶108} In *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, the Supreme Court of Ohio found that it was error for a trial court to impose court costs without first discussing the issue at the sentencing hearing. *Id.* at ¶ 1. Such error does not void a defendant's entire sentence; it merely affects the trial court's imposition of court costs. *Id.* Consequently, a trial court's error in this regard necessitates a remand for the limited purpose of reimposing court costs in open court and allowing the defendant to seek a waiver. *Id.* at ¶ 23. Courts have similarly treated a trial court's imposition of attorney fees in judgment entries without first addressing the matter at the sentencing hearing. *E.g.*, *State v. Miller*, 9th Dist. Nos. 10CA009922, 10CA009915, 2012-Ohio-1263, ¶ 97.

{¶109} Here, in its judgment entry of sentencing, the trial court ordered that Bump "pay the costs of prosecution." (Docket No. 145, p. 4). However, a review of the record reveals that the trial court did not address the payment of court costs or attorney fees at the sentencing hearing. As conceded by the State, this constitutes error and we accordingly remand this matter to the trial court for the limited purposes of informing Bump of the payment of court costs and attorney fees and allowing him to seek a waiver.

{¶110} Accordingly, we sustain Bump's tenth assignment of error.

*Assignment of Error No. IX*

{¶111} In his ninth assignment of error, Bump argues that cumulative error in the trial court proceedings deprived him of due process. We disagree.

{¶112} The cumulative error doctrine provides that "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Baucom*, 3d Dist. No. 17-03-14, 2003-Ohio-6986, ¶ 6, quoting *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, ¶ 57 (1st Dist.). The appellant must show that there is a reasonable probability that but for the errors, the trial outcome would have been different. *State v. Ray*, 3rd Dist. No. 14-05-39, 2006-Ohio-5640, ¶ 68.

{¶113} Although a portion of the trial court's judgment is being reversed and remanded as to Bump's tenth assignment of error, the error contained therein

only involves the trial court's failure to properly impose costs and attorney fees. The other assignments of error have been overruled. We acknowledge an unusual number of errors in the trial of this case. However, having reviewed the explicit testimony of the victims, and based on our previous discussion of each alleged error, we cannot conclude that there is a reasonable probability that without these errors, the trial outcome would have been different.

{¶114} Accordingly, we overrule Bump's ninth assignment of error.

{¶115} Having found no error prejudicial to Bump, in the particulars assigned and argued in the first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error, but having found error prejudicial to Bump, in the particulars assigned and argued in the tenth assignment of error, we affirm in part, and reverse in part, the trial court's judgment, and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**PRESTON, P.J., concurs.**
**WILLAMOWSKI, J., concurs in Judgment Only.**
**/jlr**